Ronald E. **DAVENPORT,**
**Plaintiff–Appellant,**

v.

**NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; Tommy Harrelson, Officially as the current Secretary of Transportation; James E. Harrington, Individually and Officially as former Secretary of Transportation; E.H. McEntire, P.E., Individually as former Chief Engineer/Raleigh; Cloyce B. Alford, Individually and Officially as former Director of Personnel; G.R. Shirley, Individually and Officially as Division Engineer/Greenville; Jerry Hardesty, Individually and Officially as former Assistant Secretary of Transportation; Sue Sutton, Individually and Officially as DOT Employee; Michael Sutton, Individually; Randy Doub, Individually and Officially as a former DOT Board Member, Defendants–Appellees.**

No. 91–1266.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1992.

Decided Aug. 18, 1993.

Monroe Jackson Nichols, Crisp, Davis, Schwentker, Page, Currin & Nichols, Raleigh, NC, argued (Lynn Fontana, Crisp, Davis, Schwentker, Page, Currin & Nichols, on the brief), for plaintiff-appellant.

James Peeler Smith, Special Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, NC, argued (Lacy H. Thornburg, Atty. Gen., Isham B. Hudson, Jr., Sr. Deputy Atty. Gen., Patsy Smith Morgan, Asst. Atty. Gen., North Carolina Dept. of Justice, on the brief), for State appellees, Thomas E. Barwick, Walker, Young & Barwick, Goldsboro, NC, on the brief, for appellee Sutton.

Before PHILLIPS, Circuit Judge, and SPROUSE and CHAPMAN, Senior Circuit Judges.

## OPINION

PHILLIPS, Circuit Judge:

Ronald E. Davenport appeals an order dismissing his action against the North Carolina Department of Transportation (DOT) and nine individuals for allegedly politically-motivated conduct resulting in Davenport's discharge from employment as a DOT engineer. Davenport sought remedies under 42 U.S.C.A. § 1983 for alleged violations of his constitutional rights to due process of law and freedom of association and, under state common law, for civil conspiracy.

The district court granted DOT's motion for summary judgment, holding that the § 1983 claim was merged by claim preclusion in a prior state court judgment rendered in judicial review of an administrative award to Davenport as remedy for his discharge, and that his claim for civil conspiracy failed as a matter of law on the summary judgment record. 776 F.Supp. 1080. We vacate as to both claims.

I

The facts, recited in the light most favorable to Davenport as nonmovant on the motion for summary judgment, *Pulliam Invest-*

*ment Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987), are as follows:

At the times in issue, Davenport, a registered Democrat, worked as a district engineer in the Lenoir County District office of DOT. He also performed private survey work under a DOT permit, which restricted such activity to approximately ten hours per week during evenings and weekends. In 1986, that private work came to the attention of appellee Michael Sutton, who chaired the Lenoir County Republican Party. Sutton initiated a meeting with appellee Jerry Hardesty, who was then DOT Assistant Secretary, to discuss allegations that DOT employees, including Davenport, were misusing state resources to further their private businesses.

At approximately the same time, appellee Sue Sutton, Michael Sutton's wife, submitted to Hardesty her application for employment as Davenport's secretary. Sue Sutton was hired in November 1986, over Davenport's objections that other candidates were more qualified. She soon began collecting what she felt was evidence of Davenport's misuse of state resources. She gave the information, including photocopies of documents taken from Davenport's desk, to her husband. In the interim, Hardesty initiated an investigation into Sutton's allegations against Davenport, who was suspended without pay in March 1987 pending the outcome of a probe by the State Bureau of Investigation.

At the time, Davenport was subject to the protections of the North Carolina State Personnel Act, N.C.Gen.Stat. §§ 126–1 *et seq.* (1991 & Supp.1992) (the Personnel Act). The Personnel Act requires just cause for any discharge, suspension, or reduction in pay or position, and notice of the "specific acts or omissions" alleged to justify such disciplinary action. *Id.* § 126–35(a). In conjunction with the North Carolina Administrative Procedure Act, *id.* §§ 150B–1 *et seq.,* the Personnel Act also creates a three-tier appeal process, beginning with the filing of a "contested case" before an administrative law

judge (ALJ) and culminating in substantial-evidence review in the state court system. *Id.* §§ 126–37, –38, 150B–45, –51.

Davenport appealed his suspension within DOT, requesting a hearing on the matter. He received none, however, despite the fact that the suspension was extended twice. In September 1987, DOT dismissed him for misuse of agency facilities, equipment and personnel. Davenport then filed a petition for a contested case hearing, claiming that DOT lacked just cause for his dismissal and had failed to follow the proper procedures "in violation of [his] constitutional rights." J.A. at 194–95.

Two months later Davenport filed a § 1983 action in Pitt County against DOT and four of its officials or employees.[1] He alleged that the Personnel Act gave him a property interest in his job; that his dismissal was politically motivated; and that defendants had violated his Fourteenth Amendment right to due process. The court denied Davenport's request for a temporary restraining order staying his suspension and dismissal, and instead stayed the § 1983 case pending the outcome of the administrative hearing.

Davenport was represented by counsel before the Office of Administrative Hearings (OAH), *see* J.A. at 194–197, and evidence was taken in compliance with the rules generally applicable in North Carolina trial courts. N.C.Gen.Stat. § 150B–29. He had full discovery rights, *id.* § 150B–28(a), and was free under the Personnel Act to show that his dismissal was motivated by discrimination based on his political affiliation, *id.* §§ 126–36, –37(a). Although it appears that Davenport then believed his suspension and dismissal stemmed from disgruntlement over his resistance to hiring Sue Sutton, J.A. at 385–86, it also appears that throughout the administrative hearing he was unaware of Michael Sutton's interactions with DOT officials. Consequently, he made no allegations regarding Sutton's involvement in his dismissal to support a finding of political discrimination. Instead, he alleged (1) that the

---

1. The individual defendants were James E. Harrington, then-DOT Secretary; Chief Engineer E.H. McEntire; Personnel Director Cloyce B. Alford; and Division Engineer G.R. Shirley. The complaint did not specify whether these defendants were sued in their official or personal capacities.

agency lacked just cause for its actions because he had not misused his position for his own private gain; and (2) that the agency had failed to provide him with the presuspension and predismissal notice and hearing to which he was entitled by statute.

The ALJ agreed with these contentions, and recommended reinstatement with full benefits, back pay, and attorneys' fees. J.A. at 235–36. That recommendation ultimately was approved after interim appeals and cross-appeals culminating in final judgment on judicial review by the North Carolina Court of Appeals. *North Carolina Dep't of Transp. v. Davenport*, 102 N.C.App. 476, 402 S.E.2d 477 (1991).[2] Davenport was reinstated in a different position at the same grade and pay as his former position. The adequacy of that reinstatement is under separate litigation.

At some point following the OAH hearing, Davenport discovered evidence of the meeting between Hardesty and Michael Sutton and specific evidence of a partisan patronage hiring system at DOT, including Sue Sutton's alleged proclamation that Davenport would never return to DOT "as long as the Republican Party was there." J.A. at 412–13. In August 1990, while DOT's appeal of the administrative judgment was pending before the North Carolina Court of Appeals, Davenport voluntarily dismissed his original § 1983 claim. He filed the instant action four days later in Wake County, adding five defendants; an allegation that defendants' politically-motivated actions violated his First Amendment right to freedom of association; a claim for civil conspiracy; and a request for punitive damages. The new complaint also named most of the defendants in their individual as well as their official capacities, and alleged specific harms including emotional distress and injury to professional reputation.[3] J.A. at 40–47.

DOT removed to federal court over Davenport's opposition, and the district court denied his motion for remand. The defendants raised defenses including the contention that the pending § 1983 claim was merged as res judicata in Davenport's administrative judgment. The district court granted DOT's motion for summary judgment as to the § 1983 claim on that basis. The court also concluded that Davenport's evidence raised no genuine issue of material fact with respect to the civil conspiracy claim and on that basis dismissed it. *Davenport v. North Carolina Dep't of Transp.*, 776 F.Supp. 1080 (E.D.N.C. 1991). This appeal followed.

## II

We first consider the district court's dismissal of Davenport's § 1983 claim on the basis of claim preclusion: that it was merged in the favorable judicial judgment upholding his state administrative award.

As the district court rightly recognized, *see* 776 F.Supp. at 1083–84, federal courts asked in a § 1983 action to give res judicata effect (in any of the doctrine's aspects) to a state court judgment are bound under the Full Faith and Credit statute, 28 U.S.C. § 1738, to apply the law of the rendering state to determine whether and to what extent the state court judgment should have preclusive effect in the federal action. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The question here, then, is whether, if the instant § 1983 action were pending in a North Carolina state court, the North Carolina courts would give the earlier state court judgment upholding on judicial review

---

2. Although the parties agreed to the joinder of their cross-appeals, DOT resisted Davenport's attempt to consolidate his § 1983 action with the appeals, contending that the administrative and § 1983 actions contained different issues, which required consideration of different evidence. J.A. at 34–35.

3. In addition to the four individuals named in the prior § 1983 action, the new complaint included past DOT Secretary Tommy Harrelson; Assistant Secretary Hardesty; former DOT Board member

Randy Doub; and both Sue and Michael Sutton. Thus, by August 1990 Davenport had sufficient evidence of Michael Sutton's interactions with Hardesty to warrant filing the new complaint. At oral argument before this court, Davenport's counsel stated that this discovery occurred only after the OAH hearing. The record shows that the key Bubbenmoyer, Sutton, and Hardesty depositions were not taken until after the Superior Court ruled on the parties' cross-appeals of the administrative decision. J.A. at 8, 271, 415, 438.

Davenport's administrative award claim-preclusive effect.[4]

■ The district court held that it would, the claims being the "same" for res judicata purposes, and on that basis dismissed the § 1983 claim. We disagree, concluding instead that under the circumstances of this case, North Carolina would not give the judgment upholding the administrative award claim-preclusive effect.

Specifically, we believe that under North Carolina law the two claims would not be considered the "same claim" for res judicata purposes—hence would lack that core requirement for claim (as opposed to issue) preclusion. *See Bockweg v. Anderson,* 333 N.C. 486, 428 S.E.2d 157, 161 (1993). We infer this from two sources: (1) the one North Carolina Supreme Court decision that has directly considered a res judicata question arising from the simultaneous or successive prosecution of parallel administrative and § 1983 claims by aggrieved public employees and (2) general discussions and applications of claim preclusion doctrine in recent North Carolina decisions.

Obviously—else we'd have no problem—no North Carolina appellate decision of which we are aware has confronted directly and resolved the issue whether this particular litigation pattern produces the same or different claims for res judicata purposes. Recently, however, in *Crump v. Bd. of Educ. of Hickory Adm. Sch. Unit,* 326 N.C. 603, 392 S.E.2d 579 (1990), a case involving this very litigation pattern, the state's Supreme Court had occasion to address an issue-preclusion question raised by the pattern and did so in a way that we think sheds pretty clear light on its view of the matter.

In *Crump,* a discharged public school teacher, having lost on his administrative challenge to the discharge before the local school board, filed in the appropriate state trial court a "joint petition and complaint," seeking by the petition judicial review of the school board decision and alleging in the complaint a § 1983 claim for denial of procedural due process in the discharge. Upon motion of the defendant school officials the trial court "severed" the two claims and, first addressing the judicial review petition, upheld the agency decision. After the trial court's decision was in turn affirmed by final judgment of the state intermediate appellate court, the § 1983 action was tried to a jury which found a federal procedural due process denial by reason of board-member bias, and awarded compensatory damages. On appeal of the resulting judgment to the state Supreme Court following its affirmance by the intermediate appellate court, the defendant-officials relied in part on the issue-preclusion defense that the bias issue had been determined in their favor by the final judgment upholding on judicial review the school board's discharge decision. A divided Supreme Court rejected this defense and affirmed, the division being on the question whether the bias issue had indeed been actually litigated and determined in favor of the defendant-officials by that earlier decision.

Four Justices of the Court wrote. All identified and analyzed the dispositive issue as one of "issue-preclusion" (and two, alternatively, as "law of the case"). 392 S.E.2d at 584 (Mitchell, J.), 392 S.E.2d at 593 (Meyer, J., dissenting), 392 S.E.2d at 597 (Martin, J., dissenting), 392 S.E.2d at 601 (Whichard, J., dissenting). At first blush, this may seem pretty clearly to reflect an agreed view that the claims were different, not the same. But not necessarily. For though issue preclusion is most frequently encountered as collateral estoppel arising from different claims, it may also be generated as direct estoppel arising from successive prosecutions of the same claim following some kinds of agreed or coerced "splittings." *See Restatement (Second), Judgments* § 27, comment b. Hence, it's theoretically possible (though we think it doubtful) that when the *Crump* Court Justices spoke of issue preclusion, they were thinking of its rarer form of direct estoppel

---

4. 28 U.S.C. § 1738 requires application of state preclusion law only where, as here, the state administrative decision has been judicially reviewed; the statute reaches only state judicial judgments. Had the administrative decision not been judicially reviewed, federal common law preclusion principles would determine its preclusive effect. *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).

within the same claim rather than its more common form of collateral estoppel between different claims. Our best bet is that they weren't. None made the point that the relatively rare brand was involved, and one, Justice Whichard, specifically identified the issue preclusion question as one of "collateral estoppel." *Crump*, 392 S.E.2d at 601. It's true that there was no need for the Court to identify the particular brand of issue preclusion thought to be before it; it wouldn't have affected issue preclusion analysis. But it seems likely that at least one of the dissenting Justices—all of whom thought that the preclusion defense somehow should succeed—would have noted that the plaintiffs only escaped flat claim preclusion by virtue of the "splitting" of their single claim at defendants' insistence—if that had been their view of things. None, in fact, attached any res judicata significance to the fact that the claims in the joined "petition and complaint" had been "severed" on motion of the defendant officials.[5]

There are other indicators in the *Crump* opinion pointing toward a different-claim rather than same-claim view of this litigation pattern. Throughout the majority opinion the claims are referred to in ways that belie any perception that they were the "same" in

the res judicata sense: "separate civil action under 42 U.S.C. § 1983," *id.* 392 S.E.2d at 580; "two separate claims brought by Crump," *id.;* "this separate civil action [alleging] injury separate and distinct from his mere dismissal," *id.* at 581; "separate civil action under § 1983," *id.* at 584. The same perceptions appear in dissenting opinions: "two causes of action ... pending simultaneously," *id.* at 593 (Meyer, J., dissenting); "[the dispositive issue is] whether plaintiff's separate § 1983 action was precluded by the 'companion principle' of res judicata, collateral estoppel," *id.* at 601 (Whichard, J., dissenting).

As indicated, none of these intimations from the several *Crump* opinions, taken individually or together, conclusively demonstrates the State Supreme Court's view on whether this litigation pattern involves the same or different claims for res judicata purposes. But we think the best evidence from them is that the claims are viewed as separate, different ones, potentially producing issue preclusion, but not claim preclusion. At least one later opinion of the state's intermediate appellate court so interprets *Crump's* implications. *See Spry v. Winston-Salem/Forsyth County Bd. of Educ.*, 105

---

5. The district court did, however, seizing on this view of *Crump* as the basis for explaining why the State Supreme Court analyzed the question before it in that case as one of issue preclusion. Specifically, the district court pointed to the fact that "the defendant in *Crump* actively and successfully sought to separate the plaintiffs' two claims," and that the majority opinion in that case had noted that "[w]hat the [defendant] used as a sword to sever the two actions cannot now be used by it as a procedural shield from potential liability." 776 F.Supp. at 1087 (quoting *Crump*, 392 S.E.2d at 584). This enabled the district court to avoid any implication from the *Crump* Court's issue preclusion analysis that claims of this sort are not the same for res judicata purposes.

We simply disagree with that perception of *Crump's* implications. As indicated, no writing Justice in *Crump* either expressly or impliedly suggested that the dispositive question before the Court was one of issue preclusion only because the defendant's conduct has split what technically was the same claim, thereby depriving itself of an otherwise flatly dispositive claim preclusion defense. The mere fact that claims joined by a plaintiff are then severed on a defendant's motion of course implies nothing about whether they are the same or different ones for res judica-

ta purposes. For this reason, the "sword-not-shield" comment in the *Crump* opinion doesn't have the significance given it by the district court. It was actually made simply to emphasize the justice of the majority's holding that the plaintiff's § 1983 due process claim of board-member bias had not been actually litigated and determined in the prior administrative proceeding. The point was that the defendant itself had argued that the issues in the two proceedings were different, i.e. that bias, the crux of the § 1983 claim, was not in the administrative proceeding. What the court was saying was only that having prevailed on that view in gaining a severance, (the sword) the defendant shouldn't in fairness now be allowed to argue that not only was the issue of bias in the other proceeding, it had been decided there in defendant's favor, with issue preclusive effect (the shield). *See Crump*, 392 S.E.2d at 584. The "sword-not-shield" comment could only have had the significance given it by the district court had it been addressed to a specific argument by the defendant for claim preclusion: having split a single claim (the sword), you can't now argue for claim preclusion (the shield). There is no indication in *Crump* that defendant advanced any such argument.

N.C.App. 269, 412 S.E.2d 687, 689 (*Crump* cited as authority for proposition, uttered in *dicta*, that going to final judgment in an administrative proceeding such as that here in issue would not preclude a later § 1983 action challenging the same governmental action, *i.e.*, that they were not the same claim for res judicata purposes), *aff'd*, 332 N.C. 661, 422 S.E.2d 575 (1992).

The North Carolina courts' general approach to claim-breadth analysis in recent times points in the same direction. We believe it fair to characterize that approach as an adoption, but a most cautious and flexible adoption, of the "transactional" approach of § 24 of the *Restatement (Second) of Judgments*. For while the state's courts have recognized and applied the key aspects of that basically broad approach—that mere differences in legal theories of claim or defense, *Rodgers Builders, Inc. v. McQueen*, 76 N.C.App. 16, 331 S.E.2d 726, 730–31 (1985), *rev. denied*, 315 N.C. 590, 341 S.E.2d 29 (1986), or in remedies sought, *North Carolina State Ports Auth'y. v. Fry Roofing Co.*, 32 N.C.App. 400, 232 S.E.2d 846, 850 (1977), *aff'd.* 294 N.C. 73, 240 S.E.2d 345 (1978), or in evidence produced, *Gaither Corp. v. Skinner*, 241 N.C. 532, 85 S.E.2d 909, 912 (1955), don't create "different" claims—the courts also have reflected all along considerable skittishness about routinely giving the transactional approach the widest application conceptually possible.

Thus, they have emphasized that "the transaction test produces a broad *res judicata* effect" and so "is appropriately applied only when the procedural rules afford parties ample opportunity to litigate in a single lawsuit, all claims arising from a transaction or series of transactions," *Ballance v. Dunn*, 96 N.C.App. 286, 385 S.E.2d 522, 525 (1989); that the doctrine "is not without limits" and "is to be applied in particular situations as justice and fairness require," *Shelton v. Fairley*, 72 N.C.App. 1, 323 S.E.2d 410, 414 (1984), *rev. denied*, 313 N.C. 509, 329 S.E.2d 394 (1985); and that the test actually "defines a process rather than an absolute concept." *Bockweg*, 428 S.E.2d at 163.

This general attitude of caution is reflected in several recent applications that we believe are instructive for this case. In *Shelton* the North Carolina Court of Appeals followed established precedent in declining to treat as the same claim for res judicata purposes successive actions to remove an executor for malfeasance and to recover damages from him for professional negligence. The court reasoned that

> [the removal proceeding] is purely statutory, with probate jurisdiction vested in the clerk of superior court ... reviewable by a superior court judge on appeal. A civil suit for damages involves a full trial with the right to have factual issues resolved by a jury.

323 S.E.2d at 416 (citations omitted). The court also emphasized the different remedies available in the two actions—removal alone in the first, compensatory damages in the second—as indicating that they should not be considered the same claim for res judicata purposes. *Id.* at 415–16.

Most recently, in *Bockweg*, the Supreme Court of North Carolina has indicated in pretty dramatic fashion its reluctance routinely to apply the transactional test in its broadest possible form. Over a sole, vigorous dissent which argued persuasively that under the transactional approach as generally applied by courts the claims were the same, the Court found that successive actions alleging separate acts of medical malpractice resulting in separate physical injuries during a continuing course of treatment in a single hospitalization did not give rise to the same claim. Acknowledging that its earlier decision in *Gaither Corp.* might be read as a general adoption of the Restatement's "transactional approach," the Court pointed out that *Gaither Corp.* involved successive actions "under an entire and indivisible contract, not a negligence action," and declined to apply the concededly broad reading of that case to "two different instances of negligence leading to two different injuries." 428 S.E.2d at 162.

We read in these decisions a continued commitment by the North Carolina courts to give weight in assessing the breadth of claims for res judicata purposes to the existence of differences in the discrete legal rights, remedies, and violations alleged in

successive actions, and to specific limitations in the procedures available in the successive forums available for their prosecutions. This undoubtedly leads, despite the North Carolina courts' general adoption of some form of a "transactional" test, to a more restrictive application of that approach than may be followed by other courts.[6]

This of course is a completely respectable legal position with powerful ties to earlier res judicata doctrine. Though no longer bound to earlier, technically narrow "cause of action" notions, it reflects a continued concern about applying claim preclusion—the most draconian of res judicata principles—in too expansive, unreflexive a manner.[7] We believe it would cause the North Carolina courts, exercising that same caution, to treat the claims here as not the same for res judicata purposes.

As in *Bockweg*, the two proceedings at issue here allege different wrongs, leading to different injuries, entitling to different remedies. In the administrative proceeding the claimed wrong was a discharge without just cause from public employment in violation of statutorily protected rights, entitling to the remedy of reinstatement with back, and possibly front, pay. In the § 1983 action there are two claimed wrongs: a deprivation by political patronage of associational rights secured against state action by the First Amendment through the Fourteenth, and a deprivation of state-created property rights without procedural due process in violation of the Fourteenth Amendment, both entitling Davenport, if established, to the remedy of compensatory and punitive damages against persons acting under color of state law.

And as in *Shelton*, the administrative proceeding that was invoked here is purely a creature of state statute, originating with base-line fact-finding by a government agency whose decision is subject then to only limited judicial review, while the § 1983 action "involves a full trial with the right to have factual issues resolved by a jury." 323 S.E.2d at 416.

The procedural and structural limitations imposed by the two processes are such that they can't, as a practical matter, "afford parties [such as plaintiff here] ample opportunity to litigate in a single lawsuit, all claims arising from [the] transaction or series of transactions." *Ballance*, 385 S.E.2d at 525. Though the constitutional claims asserted in the § 1983 action could be raised by the plaintiff in the administrative proceeding, their utility would be limited there to rebutting any "just cause" defense raised by the defendants and to insuring procedural fairness in that proceeding. They could not be invoked in that proceeding to provide the full range of constitutional remedies available in a § 1983 action.

And though the § 1983 action might be brought in either state or federal court free of any requirement of administrative remedy exhaustion, *Patsy v. Bd. of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (federal court), *Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (state court), the state's exhaustion requirement presumably would still prevent joinder with the § 1983 claim of non-constitutional state-law discharge claims as fall-back alternatives in case the more difficult constitutional claims were to fail of proof. *See Huang v.*

**6.** A prime example of such a broader application may be found in *Welch v. Johnson*, 907 F.2d 714 (7th Cir.1990), upon which the district court principally relied in finding the claims here to be the same for res judicata purposes. *Welch* involved a quite similar litigation pattern to that in issue here, and were it authoritative on the question of North Carolina law we address, would be difficult, if not impossible, to distinguish on any principled basis. But it is not authoritative on that issue, involving as it does the Seventh Circuit's application (a correct one we can assume) of Illinois claim preclusion principles. *Id.* at 719 n. 3. The district court thought it "not inconsistent" with North Carolina's treatment of claim preclusion doctrine, 776 F.Supp. at 1086 n. 2, but, as our discussion of that doctrine in text

indicates, we are satisfied that Illinois' treatment (as interpreted and applied in *Welch*) is not consistent with that of North Carolina.

**7.** A position that in fact can easily be accommodated within current Restatement "transactional test" claim preclusion doctrine. This expressly recognizes the need, in the interests of fairness, to maintain just such an attitude of caution and flexibility in applying claim preclusion doctrine, *see Restatement, Second, Judgments* § 26(c), (d), and admonishes a "pragmatic" approach to deciding what "factual groupings" constitute "transactions" and "series of transactions." *Id.* § 24 comment b.

*North Carolina State Univ.*, 107 N.C.App. 710, 421 S.E.2d 812 (1992). Therefore, to treat these two claims as the same for res judicata purposes would effectively force upon parties situated as is Davenport here a preclusive election between two remedial paths neither of which would allow fair litigation of all claims that otherwise properly could be asserted.[8] Such a result seems flatly at odds with the North Carolina courts' current approach to claim-breadth analysis for res judicata purposes.

In combination, we believe these procedural and substantive differences between the state administrative claim and the § 1983 claims alleged by plaintiff would cause them to be treated as different claims for res judicata purposes by the North Carolina courts. Accordingly, we conclude that the district court erred in dismissing the § 1983 action on the basis of claim preclusion.[9]

### III

We next consider Davenport's contention that the district court erred in dismissing his state law civil conspiracy claim, now pendent to the removed § 1983 claim. Reviewing that decision *de novo, see Pulliam*, 810 F.2d at 1286, we agree and reverse.

■ Under North Carolina law, civil conspiracy consists of "an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way, and, as a result of acts done in furtherance of, and pursuant to, the agreement, damage occurs to plaintiff." *Fox v. Wilson*, 85 N.C.App. 292, 354 S.E.2d 737, 743 (1987). Evidence of such an agreement may be indirect, but must be sufficient to create more than a suspicion or conjecture. *Henderson v. LeBauer*, 101 N.C.App. 255, 399 S.E.2d 142, 145 (1991), *rev. denied*, 328 N.C. 731, 404 S.E.2d 868 (1991).

The district court dismissed the claim on the basis that Davenport's evidence as forecast by his summary judgment materials failed as a matter of law to create a genuine issue as to the existence of the required agreement. We disagree.

8. Claim preclusion doctrine contemplates that a fair opportunity be provided in some forum, by some form of a single unitary proceeding, to maintain all the claims that are considered the "same claim" under the jurisdiction's preclusion rules. *Restatement, Second, Judgments*, § 26 comment c. It does not contemplate more than one such forum and process. Thus, a plaintiff's invocation of a state forum that can't handle all her claims is at risk of preclusion of all, just so long, but only so long, as another, adequate forum was available. *Id.* § 24(g). Joinder of everything that conceivably could be thought the same claim is the normal device for securing a unitary, single adjudication of all that which constitutes the "same" claim for res judicata purposes. *Id.* § 24, comment h. A special mark of the unfairness of treating the claims at issue here as the same is the impossibility of *truly* effecting such a "joinder." This is illustrated by the awkward efforts (not authorized by any procedural rule) in *Crump* and *Davenport* to effect such a joinder by filing a "joint" petition for review and § 1983 complaint once an administrative decision had been entered. At that point, however, it is technically impossible to adjudicate these two "claims" by a single, unitary process—they are not now, as the *Restatement* suggests is important, a "convenient unit for trial purposes." *Id.* § 24(b). The administrative claim is before the court for strictly limited judicial review; the § 1983 claim, for plenary adjudication, possibly by a jury. The only solution at that point has been to confirm the impossibility of proceeding as though they were the "same claim" by "severing" them for separate adjudication. This is perhaps the strongest possible indication that, pragmatically assessed, *id.* § 24(b), they cannot properly be treated as the "same" claim. *Cf. Batch v. Town of Chapel Hill*, 326 N.C. 1, 387 S.E.2d 655, *cert. denied*, 496 U.S. 931, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990) (attempted joinder of petition for certiorari to review city council decision and § 1983 challenge to decision improper; impossible to adjudicate as unit.)

9. That such claims are not properly treated as the same for res judicata purposes does not of course mean that all the virtues of res judicata in preventing relitigation of settled matters are made unavailable in this litigation pattern. Issue preclusion remains a possibility whenever its elements—actual litigation of same issues, necessity to decision, privity, etc.—are present. In particular cases, it may as effectively avoid relitigation as would claim preclusion. We need express no opinion on its possible operation in this case, that being a matter for first instance consideration by the district court if on remand it is sought to be invoked.

Neither, in view of our conclusion that the two claims here are not the same for claim preclusion purposes, need we address the district court's conclusion that the privity of parties requirement was met here also. That may or may not become relevant on remand, depending upon whether issue preclusion is now invoked.

Davenport proffered evidence of the defendants' shared party affiliation. He also proffered testimonial evidence to the effect that party affiliation was a consideration in some hiring decisions made by the defendant officials, *e.g.*, J.A. at 428–29, and that employees were pressured by these defendants to change their party affiliation as a condition of job retention. J.A. at 410. He offered proof that Hardesty, a high-ranking DOT official, attended a meeting called by the Chairman of the Lenoir County Republican Party to discuss Davenport's private surveying business; that with Hardesty's assistance the wife of the Party Chairman was installed as Davenport's secretary over his objections; that she not only surreptitiously gathered evidence of Davenport's alleged improprieties, but that she turned the evidence over to her husband before it made its way into the hands of upper-level DOT employees; and that she stated that he would never return to DOT "as long as the Republican Party was there." J.A. at 160–62, 409–413, 439.

We believe that this forecast of evidence, when taken in a light most favorable to Davenport, raises a genuine issue of material fact as to whether the individual defendants agreed to proceed against Davenport motivated primarily by a discriminatory animus related to his political affiliation, clearly an illegal act if proven. On the summary judgment record, Davenport was entitled to a trial of his civil conspiracy claim.

### IV

For the foregoing reasons, we vacate the judgment of the district court and remand for proceedings consistent with this opinion.

VACATED AND REMANDED.