CONSTANCE A. HENDERSON, Executrix of the Estate of Virgil E. Henderson, Plaintiff v. E. JOSEPH LeBAUER, BRUCE R. BRODIE, JEFFREY KATZ, DRS. LeBAUER, WEINTRAUB, BRODIE, PATTERSON & ASSOCIATES, P.A., DAVID L. RINEHULS, CHARLES M. HASSELL, AND THE MOSES H. CONE MEMORIAL HOSPITAL, Defendants

No. 9018SC332

(Filed 15 January 1991)

1. **Conspiracy § 2.1 (NCI3d) — wrongful death — conspiracy to misrepresent cause of death — insufficiency of evidence**

In an action for wrongful death arising from defendants' alleged medical negligence in treating plaintiff's husband where plaintiff further alleged that there had been a conspiracy among defendants to cover up and misrepresent the cause of decedent's death, the trial court properly granted summary judgment for defendants, since a threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed, but plaintiff's evidence of notes and phone calls between defendants did not reasonably lead to anything other than suspicion or conjecture that there was ever any underlying agreement.

**Am Jur 2d, Death § 77.**

2. **Physicians, Surgeons, and Allied Professions § 17 (NCI3d) — malpractice — treatment below standard of care — punitive damages — sufficiency of evidence**

The trial court erred in entering summary judgment for defendants on plaintiff's claims for punitive damages arising from defendants' allegedly gross negligence in their medical treatment of plaintiff's husband where plaintiff's offer of proof included affidavits and depositions from many medical experts, including two who stated that defendants' method of treatment of decedent's anemia and congestive heart failure and the improper reporting of heart catheterization results were far below the standards of practice in the community.

**Am Jur 2d, Physicians, Surgeons, and Other Healers § 371.**

**Allowance of punitive damages in medical malpractice action. 27 ALR3d 1274.**

HENDERSON v. LeBAUER

[101 N.C. App. 255 (1991)]

3. **Physicians, Surgeons, and Allied Professions § 16.1 (NCI3d) — doctor who performed autopsy — claims based on conspiracy theory — insufficiency of evidence**

> The trial court in a medical malpractice case did not err in entering summary judgment for defendant who performed the autopsy on plaintiff's decedent, since plaintiff's claims against him focused solely on the existence of a conspiracy, but plaintiff's forecast of evidence was insufficient to support that theory; moreover, the court could not pass on new theories of liability raised by plaintiff for the first time on appeal.

> **Am Jur 2d, Death § 77.**

4. **Appeal and Error § 118 (NCI4th) — denial of summary judgment motion — appeal interlocutory**

> In a medical malpractice action defendant hospital's appeal from denial of its motion for summary judgment was interlocutory, since denial of a summary judgment motion is generally not immediately appealable, even if the trial court has attempted to certify it for appeal under N.C.G.S. § 1A-1, Rule 54(b).

> **Am Jur 2d, Appeal and Error § 104.**

> **Reviewability of order denying motion for summary judgment. 15 ALR3d 899.**

APPEAL by plaintiff from judgment entered 13 November 1989 in GUILFORD County Superior Court by *Judge Lester P. Martin, Jr.* Defendant Moses H. Cone Memorial Hospital (Hospital) also appeals from this judgment. Heard in the Court of Appeals 23 October 1989.

Plaintiff brought this wrongful death action for compensatory and punitive damages for the medical negligence of defendants in treating plaintiff's husband. She also alleged that there had been a conspiracy among the defendants (excluding defendant Rinehuls) to cover up and misrepresent the cause of Mr. Henderson's death. The defendants moved for summary judgment on all issues, with defendants LeBauer, Brodie, Katz, Rinehuls, and the professional group subsequently withdrawing their motion as to plaintiff's claim for compensatory damages for medical negligence.

Plaintiff's forecast of the evidence before the trial court tended to show that plaintiff's decedent was admitted to Wesley Long

Hospital on 8 March 1985 by defendant Brodie for evaluation of possible heart problems. He was discharged on 12 March 1985 and instructed to take two aspirins daily. Defendant Brodie examined decedent again on 27 March 1985, and then admitted him to defendant Hospital for elective coronary angiography. Both his hematocrit and hemoglobin levels had declined.

On 3 April 1985, decedent underwent a cardiac catheterization procedure. Different sets of coronary angiographic results are listed in Brodie's handwritten notes, the typed catheterization results and decedent's discharge instructions. Following the procedure, plaintiff was enlisted to hold a sandbag over decedent's catheter insertion wound for several hours. On 5 April 1985, decedent was discharged from the hospital, despite plaintiff's protests. Neither the discharge order nor the discharge instructions were countersigned at the time by a physician. On 7 April 1985, decedent returned to the hospital, complaining of pain in his left leg and groin area (where the catheter had been inserted). He was readmitted.

Defendant LeBauer diagnosed decedent as suffering from a false aneurysm. Surgery was performed in an attempt to repair the problem. Decedent continued to show a decrease in hematocrit and hemoglobin levels. The hemoglobin level had dropped to the "panic level" on 12 April 1985, but there was no notation in the laboratory records that this was called to the attention of the nurses or physicians. Decedent was scheduled for discharge on 13 April 1985. During the night of 12 April, however, decedent's condition worsened. LeBauer was called at his home at 11:15 and again at 11:50. His chart entries begin at 12:30. LeBauer worked to save decedent for approximately three hours, including administering Heparin, an anticoagulant. Decedent had a history of gastrointestinal bleeding. Decedent was pronounced dead at 3:30 a.m.

Defendant Hassell performed an autopsy on 13 April 1985. The preliminary diagnoses listed massive gastric hemorrhage, marked coronary arteriosclerosis, and hypertrophied myocardium. These diagnoses were sent to the physicians and to plaintiff in a letter. On a copy of the letter sent to Brodie is the notation "Joe-call me about this." The certificate of death prepared by LeBauer listed the cause of death as cardiac arrest due to myocardial ischemia as a result of coronary artery disease. He listed a massive gastric hemorrhage as a "significant condition."

Plaintiff's daughter began inquiring into the cause of death. On 23 April 1985, she met with LeBauer and Brodie at their offices. LeBauer reiterated his opinion that her father had died as a result of myocardial ischemia and that the gastric hemorrhage was an incidental finding. She asked for copies of her father's records, which they made available to her the next day. She then consulted with other physicians and medical experts for their opinions regarding the quality of care received by her father and the cause of death.

LeBauer did not finish the discharge summary until 24 June 1985. In this summary, he states that decedent suffered chest pain at 11:45 on the night of his death, though there is no notation of this in the nursing progress notes. Hassell finished the autopsy report on 11 July 1985. When it was completed, he sent a copy to LeBauer with a memo stating: "Joe: here is the 'uncorrected' copy of autopsy on Virgil Henderson. I will be mailing it to his wife, Mrs. Constance Henderson, in the next few days. Please contact me if you have a question or see an error." It was not mailed until after the final public hearing on 17 July 1985 for competitive review of the application defendant Hospital had submitted for another cardiac catheterization laboratory. The autopsy listed coronary arteriosclerosis, marked, right and left coronary systems, hypertrophied myocardium, arteriosclerosis of aorta, marked, atheromatous embolization, multiple organs with micro-infarcts, and ischemic necrosis of the myocardium. Massive gastric hemorrhage was not included in the list of principal diagnoses. Plaintiff's daughter challenged this autopsy in a letter to the Hospital's president, who stood by it.

Defendants' forecast of evidence tended to show that Brodie performed the catheterization and made a preliminary set of notations, then finalized his assessment of decedent's coronary artery disease. After the procedure, decedent was seen several times by members of the defendant cardiology group. After monitoring decedent for two days, he was released without protest. The order was countersigned by defendant Katz.

The surgery ordered to repair the false aneurysm was successful. LeBauer noted the falling hemoglobin and hematocrit levels, but decided against a blood transfusion. Decedent appeared to be stable, and LeBauer decided that the potential risks of the procedure outweighed the potential gains. Doctor Burney was aware

of the hematocrit and hemoglobin levels on 12 April 1985, and noted that the hematocrit was stable.

On the night decedent died, LeBauer was called and he ordered certain tests over the phone. He was called again, and went straight to the hospital, arriving just as Code Blue was declared. He talked with those who had been attending decedent and began resuscitative efforts. LeBauer felt that the dose of Heparin was necessary, based on decedent's clinical condition.

LeBauer obtained decedent's family's permission to have an autopsy performed. The initial stage of the autopsy was a gross examination from which tentative diagnoses were drawn. The 15 April 1985 letter pointed out: "I emphasize that these are 'gross tentative diagnoses.' These diagnoses may be altered and other diagnoses may be added following the microscopic examination of the various organs."

Hassell sent a final copy of the autopsy report to LeBauer, but the two did not communicate any further about the report. Hassell did not include massive gastric hemorrhage in the list of principal diagnoses in the final report since he observed no areas of ulceration within the stomach and no blood was observed in the bowel. LeBauer's discharge summary, in which he claims that decedent suffered chest pain, was prepared from his progress notes which were prepared at the time of the treatment.

The trial court granted defendants' motion for summary judgment on all claims for conspiracy, to include all claims against Hassell and all claims alleged in plaintiff's fourth claim for relief, as well as any claim for punitive damages. Defendant Hospital's motion for summary judgment as to plaintiff's claim for compensatory damages against it for medical negligence was denied. Plaintiff and defendant Hospital have filed separate appeals.

*Hatfield, Mountcastle, Deal & Van Zandt, by John P. Van Zandt, III, for plaintiff-appellant/cross-appellee.*

*Tuggle, Duggins, Meschan & Elrod, P.A., by Joseph E. Elrod III and Robert A. Ford, for defendant-appellee Charles M. Hassell and defendant-appellee/cross-appellant Moses H. Cone Memorial Hospital.*

*Bell, Davis & Pitt, P.A., by William Kearns Davis and J. Dennis Bailey, for defendants-appellees E. Joseph LeBauer, Bruce R. Brodie, Jeffrey Katz, Drs. LeBauer, Weintraub, Brodie, Patterson & Associates, P.A., and David L. Rinehuls.*

WELLS, Judge.

When a motion for summary judgment is granted, "the critical questions for determination upon appeal are whether on the basis of the materials presented to the trial court, there is a genuine issue as to any material fact and whether the movant is entitled to judgment as a matter of law." *Oliver v. Roberts*, 49 N.C. App. 311, 271 S.E.2d 399 (1980), *cert. denied*, 276 S.E.2d 283 (1981). Plaintiff claims that on the basis of the materials presented to the trial court, genuine issues of material fact remain regarding her allegations of conspiracy, the liability of defendant Hassell, and her claim for punitive damages. Defendant Hospital also assigns error to the denial of its motion for summary judgment on the issue of its alleged medical negligence. We affirm in part and reverse in part.

[1] Defendants have correctly pointed out that there is no action for civil conspiracy recognized in North Carolina. In *Johnson v. Beverly-Hanks & Associates, Inc.*, 97 N.C. App. 335, 388 S.E.2d 584, *disc. review on additional issues denied*, 326 N.C. 482, 392 S.E.2d 90 (1990), we noted the North Carolina rule:

> [a]ccurately speaking, there is no such thing as a civil action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone. The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof — the damage — not the conspiracy or the combination. The combination may be of no consequence except as bearing upon rules of evidence or the persons liable. (Citations omitted).

Defendant is not seeking damages, however, arising out of the alleged conspiracy or combination. She is seeking damages arising out of acts she claims were committed pursuant to it — covering up and misrepresenting the cause of her husband's death. In *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984), which also involved a wrongful death action and allegations of a cover-up, the Court

held that actions taken pursuant to a conspiracy which tended to obstruct, impede or hinder public or legal justice were actionable.

A threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed. The existence of a conspiracy requires proof of an agreement between two or more persons. *Fox v. Wilson*, 85 N.C. App. 292, 354 S.E.2d 737 (1987). Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981).

Plaintiff has not forecast sufficient evidence that an agreement was reached between any of the defendants to perform the acts she complains of. She has pointed to a note on a copy of defendant Hassell's letter which contained his preliminary diagnoses which states "Joe-call me about this," various phone conversations, and a memo from Hassell to LeBauer stating "Joe: here is the 'uncorrected' copy of autopsy on Virgil Henderson. I will be mailing it to his wife, Mrs. Constance Henderson, in the next few days. Please contact me if you have a question or see an error." Plaintiff has also produced a great deal of circumstantial evidence which she claims points to a conspiracy, but we hold that this evidence does not reasonably lead to anything other than suspicion or conjecture that there was ever any underlying agreement. The trial court did not err in rendering judgment on this issue.

[2] Plaintiff also assigns error to the entry of summary judgment as to all claims for punitive damages. Plaintiff's claims are grounded in her conspiracy claim and allegations of gross negligence against all defendants. As stated, we affirm the court's judgment that the offer of proof does not raise a jury question as to the existence of a conspiracy. Any issue of punitive damages, then, must arise out of gross negligence.

A personal representative may bring a claim in a wrongful death action for "[s]uch punitive damages as the decedent could have recovered had he survived, and punitive damages for wrongfully causing the death of the decedent through maliciousness, wilful or wanton injury, or gross negligence." N.C. Gen. Stat. § 28A-18-2 (1982). While there is authority which equates gross negligence with wanton conduct, *see Bullins v. Schmidt*, 322 N.C. 580, 369 S.E.2d 601 (1988), we cannot apply this definition in the context

of this statute. "By providing for recovery of punitive damages upon a showing of 'maliciousness, wilful or wanton injury, *or* gross negligence' it appears that the General Assembly intended to establish three separate categories of conduct which would afford a recovery." *Cole v. Duke Power Co.*, 81 N.C. App. 213, 344 S.E.2d 130, *disc. review denied*, 318 N.C. 281, 347 S.E.2d 462 (1986). N.C. Gen. Stat. § 28A-18-2 allows recovery of punitive damages in wrongful death actions involving gross negligence even when no wilful or wanton conduct was involved. *Id.* To establish gross negligence, the plaintiff must show negligence of an aggravated character. *Id.*

In a medical malpractice action, generally there must be expert testimony that tends to show a deviation from the normal standard of care. *Assaad v. Thomas*, 87 N.C. App. 276, 360 S.E.2d 503 (1987), *disc. review denied*, 321 N.C. 471, 364 S.E.2d 917, *reh'g denied*, 321 N.C. 747, 366 S.E.2d 856 (1988). Plaintiff's offer of proof included affidavits and depositions from many medical experts. Dr. Thomas A. Preston stated in his affidavit that:

> The attending clinicians were negligent in not noting the severity of anemia, and treating it properly. Not only did the anemia go untreated, but the patient had a history of a GI bleed in 1982, which would make any finding of anemia all the more urgent. The patient was never treated with packed red blood cells, despite a diagnosis of anemia and grossly insufficient treatment of ferrous sulfate. In summary, there was negligence in not recognizing the severity of the anemia and treating it sufficiently, and negligence in not diagnosing and treating congestive heart failure. I will testify that negligence in these areas was a proximate cause to the patient's death. *The care of the attending physicians was far below the standard of practice in any community in this country, and even minimal attention to either the congestive heart failure or the anemia would more than likely have saved the life of Virgil E. Henderson.* (Emphasis added).

Dr. Embree H. Blackard stated in his affidavit that:

> There was an intent to send him home with his hemoglobin and hematocrit still not reversed and on the upside. Therefore one could anticipate further hypoxia, further effect on increased cardiac output and further danger to an individual with a compromised cardiac status. Diagnosing the anemia and ordering ferrous sulfate indicated that they were aware of the anemia.

*However, it was a grossly inappropriate treatment.* Not to have given packed cells well before his fatal event is substandard and was a proximate cause of his death. (Emphasis added).

There was an official typed catheter report indicating a mild degree of obstruction. However, the progress notes in the chart indicated a more severe degree of narrowing. This would correlate with the autopsy findings. To have one catheterization report with such divergent results is substandard and indicates a sloppiness. The official typed report would be the one given the most weight by the subsequent doctors and this is the one that is abnormally reported. *This is quite substandard.* This would serve to have the effect of misleading subsequent doctors if their judgment relied on this report. (Emphasis added).

We hold that this expert testimony was a sufficient forecast of evidence to survive a summary judgment motion as to whether the treatment provided by defendants LeBauer, Brodie, and Katz rose to the level of "aggravated negligence" or an "extreme departure from the ordinary standard of conduct." *See Cole, supra.* LeBauer, Brodie, Katz, and the defendant professional association have admitted that these physicians were employed by Drs. LeBauer, Weintraub, Brodie, Patterson & Associates, P.A., and acted in the course and scope of their employment. Summary judgment on the punitive damages issue, then, was also inappropriately granted in favor of the association. *See Mazza v. Medical Mut. Ins. Co. of North Carolina,* 311 N.C. 621, 319 S.E.2d 217 (1984); *Binder v. General Motors Acceptance Corp.,* 222 N.C. 512, 23 S.E.2d 894 (1943). We affirm the judgment of the trial court as to defendants Rinehuls, Hassell and Hospital.

[3] Plaintiff also assigns error to the entry of summary judgment on all claims against defendant Hassell. In both her complaint and amended complaint, plaintiff's claims against Hassell focus solely on the existence of a conspiracy. In her brief, she attempts to argue that Hassell was negligent and grossly negligent in supervising the Hospital's "quality assurance program," based primarily on the fact that there is no notation in the laboratory records that decedent's "panic-level" hemoglobin was reported to any physician or nurse. She also argues that Hassell was negligent in conducting his investigation into the cause of death. We find nothing in the record which would indicate that this theory of liability was

asserted in the complaint or in the trial court. The court's order indicates to the contrary, stating:

> IT IS THEREFORE ORDERED AND ADJUDGED that the defendants' motions as to all claims for conspiracy, to include all claims against defendant Charles M. Hassell and all claims alleged in plaintiff's fourth claim for relief, are allowed and the same are dismissed with prejudice. . . .

We are therefore left to assume, then, that plaintiff is asking us to pass on these theories of liability for the first time on appeal. This we cannot do. *Bryant v. Eagan*, 88 N.C. App. 741, 364 S.E.2d 704, *cert. denied*, 322 N.C. 325, 368 S.E.2d 863 (1988). The trial court's order is affirmed as written regarding Hassell.

[4] Defendant Hospital's appeal is interlocutory. The denial of a motion for summary judgment is not a final judgment, and is generally not immediately appealable, even if the trial court has attempted to certify it for appeal under Rule 54(b) of the North Carolina Rules of Civil Procedure. *Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 302 S.E.2d 868 (1983). We fail to see how any substantial right will be lost by a trial of the issues. The Hospital's appeal is therefore dismissed.

As to plaintiff's appeal,

Reversed in part, affirmed in part.

As to defendant Hospital's appeal,

Dismissed.

Judges COZORT and LEWIS concur.