An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-128

NORTH CAROLINA COURT OF APPEALS

Filed: 16 September 2014

TIMOTHY D. PRICE,
    Plaintiff,

v.

PAUL LINDSEY JONES,
    Defendant.

Cumberland County
No. 12 CVS 2720

Appeals by Plaintiff and Defendant from Order entered 7 November 2013 by Judge Mary Ann Tally in Cumberland County Superior Court. Heard in the Court of Appeals 4 June 2014.

*Hedahl & Radtke, by Debra J. Radtke, for Plaintiff.*

*McCoy Wiggins Cleveland and O'Connor, PLLC, by Richard M. Wiggins and Daniel S. Harrison, for Defendant.*

STEPHENS, Judge.

*Procedural History and Factual Background*

This case arises from claims brought by Plaintiff Timothy D. Price against Defendant Paul Lindsey Jones for criminal conversation, alienation of affection, and breach of fiduciary relationship. Defendant denied the material allegations of

Plaintiff's complaint and moved for summary judgment on 22 October 2013, following discovery. The matter was heard on 4 November 2013. The parties' forecast of evidence indicates the following pertinent facts:

Plaintiff married Karen Price on 26 June 1994 in North Carolina. They had two children during the marriage. They separated on 27 March 2009 and were divorced on 27 April 2010. Plaintiff and Karen became acquainted with Defendant and his former wife, Carol Jones, in the late 1990s through Defendant's employment as a mortgage loan officer with Branch Banking & Trust ("BB&T"). Defendant helped Plaintiff and Karen refinance a number of loans.

In or around 2004, Defendant and Karen began an extramarital affair. Around the same time, Plaintiff, Karen, Defendant, and Carol began spending time together as friends. They socialized with one another, visited each other's homes, went on vacations together, and spent time with each other's children.

On 1 January 2009, following a New Year's Eve party at the Jones family residence, Carol began to suspect that her husband was having an affair with Karen. Around 1:00 or 2:00 a.m., after Plaintiff and Karen had left the home, Defendant's daughter

informed Carol that she had overheard her father on the phone, "and she heard . . . him say Karen's name, and he said 'I want to lick the pink thong off of your ass.'" A few days later, Carol checked the family's phone records and discovered that Defendant "had called Karen's number frequently during the day, every day, and sometimes [he] would talk for up to an hour or more." This usually occurred after Carol went to bed or early in the morning, "like when he was supposed to be on his way to work."

At that point, Carol contacted Plaintiff and informed him about the New Year's Eve incident and her husband's phone records. According to Plaintiff, Carol did not elaborate on the specifics of the texts, "other than [noting] the fact that they had [been] text[ing] each other." Plaintiff did not believe Carol and responded that he did not think "[Karen] would do that to me," commenting that his wife thought of Defendant "like a brother." Carol then informed Plaintiff that the couples would no longer be socializing with one another, and Plaintiff said he was "sorry [she felt] that way."

Carol continued to talk to Plaintiff through March of 2009. Based on Plaintiff's deposition testimony, she did not give him any other specific information until the middle of March.

Instead, Carol only mentioned that the relationship "seemed suspicious." Carol's deposition indicates, to the contrary, that she called Plaintiff on at least one other occasion, in February, after discovering another phone in her home. The phone was "not [Defendant's] regular cell phone." It was registered under a separate account, and all the calls and text messages were connected to "just one phone number." The text messages said "I love you, marry you" and referenced Plaintiff and his children, indicating to Carol that the communications came from Karen. When Carol told Defendant "about the second phone and the texts that I read, and that I knew they were having an affair, . . . he cried on the phone."[1]

At the same time, Plaintiff and Karen continued to socialize with Defendant. Plaintiff mentioned Carol's concerns to them, and "they would just kind of make light of it" and imply that Carol "didn't want the four of us to hang out anymore." During Defendant's deposition, his attorney asked whether Karen denied that they were having an affair, and Defendant commented that "[s]he made it — she made it sound absurd." Plaintiff commented that, while "Carol . . . felt

---

[1] In his brief, Plaintiff suggests that this may not have happened, noting that Plaintiff's deposition "does not reflect [that]."

strongly that something was going on[,] . . . I didn't, I didn't feel that. I just felt like that we were all three having a good time, and [Carol was] the, the worm in the apple . . . ."

On 6 March 2009, Karen told Plaintiff that she had talked with an attorney and wanted to separate. Shortly thereafter Plaintiff and Karen began living in different sections of the house. Plaintiff nonetheless held out hope that the relationship could be mended, noting that Karen "thought that maybe we could work things out." Plaintiff also stated that he and Karen were attending counseling sessions at that time, albeit with separate counselors.

Plaintiff and his father went to see an attorney on 9 March 2009.[2] They talked about Karen, and the attorney told Plaintiff that "there was a snake in the grass," recommending that Plaintiff "find out what's going on in [his] house." Plaintiff did not believe his attorney and said that he thought Karen was "just unhappy," again stating that "she wouldn't do that to me."

On 18 March 2009, a Wednesday, Plaintiff's father hired a private investigator based in Fayetteville, North Carolina to confirm the father's "assumption" that Karen was cheating.

---

[2] Different counsel represents Plaintiff on appeal.

During his deposition, the investigator testified as follows regarding the father's reason for hiring him:

> Q    And the — and what [the father] hired you was to try to either prove or disprove what he believed was happening, wasn't he?
>
> A    Don wanted to put closure on it. Ruin or no ruin, he wanted to make — he wanted to step up to the table and put a closure; it was half that he wanted to put a cease and that was it.
>
> Q    He wanted to know what was going on.
>
> A    That's correct.
>
> Q    And if it was true, he wanted to know it; if it was not true, he wanted to know it.
>
> A    That's correct.

Initially, the investigator worked with Plaintiff's father. According to the investigator, Plaintiff appeared to be "in denial more than anything. He didn't want to — I don't know if [he] wanted to know it." The father "was pretty adamant about . . . keeping [Plaintiff] aware of what was going on[, however,] because [Plaintiff], as far as emotion-wise[,] couldn't take a lot of things . . . [and the father] was pretty adamant about [the fact that] he didn't like what was going on . . . ."

Around the same time, Carol contacted Plaintiff to let him know that Defendant was planning to take a weekend golf trip to

the beach. When Carol asked about Karen's plans for the weekend, Plaintiff responded that Karen was going to the beach with some of her girlfriends. Carol expressed her belief that Karen and Defendant were actually planning to meet one another at the beach, commenting that Karen did not have any girlfriends. Plaintiff was not convinced, but directed the investigator to follow Karen to the beach. Explaining his rationale for this decision, Plaintiff testified that:

> [W]ith the correspondence that, that took place between [Defendant's] wife Carol telling me . . . [that Defendant] was going down and [Karen] was going down, and all the things that were taking place, I decided that that would be an opportunity, that if they were going to meet or if they were going to be together, then that would be an opportunity for them to be seen together.
>
> And my whole, my whole thing was, is I don't believe that they are doing anything. I'm spending this money, but I honestly don't think that they're going to find out anything.

Despite this thought process, Plaintiff also admitted, during a 17 March 2009 meeting with the investigator, to "allud[ing]" to the fact that "his wife of several years . . . had been having an affair with their banker at BB&T by the name of Paul Jones."

Karen left for the beach around 11:00 a.m. on Friday, 20 March 2009, and the investigator followed her. Carol had

informed the investigator that Defendant was going to Ocean Isle for a golf tournament, and Plaintiff told him that "they" were probably going to his house at Holden Beach, which is a few miles away. As a result, the investigator went ahead and waited for Karen at the Holden Beach address provided by Plaintiff.

Karen arrived at the house around 3:00 p.m., and the investigator did not see anyone with her. He maintained surveillance of the house until early that morning. Feeling tired, the investigator left at 12:28 a.m. and returned around 6:00 a.m. on Saturday. Karen's vehicle was gone. As a result, the investigator went to Ocean Isle to look for Defendant. The investigator was unable to locate Defendant and called Plaintiff around 2:00 p.m. to let him know. Plaintiff responded with "relief[, making] some statement like 'Carol's wrong,'" and told the investigator not to worry about the rest of the surveillance. Plaintiff "was pretty adamant that's — it wasn't nothing there, and that's when I called if [sic] off, but I said, 'Well, I'll just keep my [assistant] down there[,] and we'll do random spot checks . . . late Saturday and Sunday."

The investigator left for Fayetteville around 2:00 p.m. that Saturday. As he was leaving, Plaintiff told him that Karen was shopping at the mall outlets near Conway, South Carolina.

Plaintiff said that Karen was with "a friend" and conveyed the feeling that Karen and Defendant were staying in Myrtle Beach, South Carolina. The investigator continued driving to Fayetteville and arrived back around 4:00 p.m. The assistant remained at Holden Beach and made "several drive-bys" of the residence through Saturday evening. The assistant did not observe Karen or Defendant at the residence, and, around 8:13 p.m., Plaintiff informed the investigator that Karen was at Carrabba's Italian Grill in North Myrtle Beach. Plaintiff later revised the location to Bonefish Grill in North Myrtle Beach and directed the investigator to look for Karen there. The assistant was still at Holden Beach, approximately an hour to an hour and fifteen minutes away, and the investigator was concerned that Karen and Defendant would be gone by the time the assistant arrived. Consequently, they "decided just to call off the surveillance."

The next day, Sunday, 22 March 2009, Plaintiff called the investigator and told him that Karen was not at Holden Beach. Though there is no dispute that Karen and Defendant actually spent the weekend in Myrtle Beach,[3] the investigator was unable

---

[3] Karen admitted this fact to the investigator after she was discovered.

to confirm this fact during his investigation. Later that day, Plaintiff told the investigator to "hold off" on the investigation until Wednesday, 25 March 2009.

On either Wednesday, 25 March 2009, or Thursday, 26 March 2009, Plaintiff discovered Karen's relationship with Defendant.[4] Plaintiff went home unexpectedly during the workday and saw Karen pulling out of the driveway. At that point, Karen called him to say she was going to McDonald's to get her credit card. Plaintiff followed her and saw Defendant lying in the backseat of the car. Plaintiff eventually called the investigator and directed him to confront Karen and Defendant, who had returned to Plaintiff's residence. The investigator discovered Defendant in Plaintiff's garage, and both Defendant and Karen admitted to the affair.

Plaintiff filed his complaint on 23 March 2012. On 7 November 2013, three days after the hearing on Defendant's motion for summary judgment, the trial court allowed the motion "as to [Plaintiff's action for c]riminal [c]onversation based upon the [s]tatute of [l]imitations" and denied the motion in all other respects. Plaintiff filed notice of appeal regarding

---

[4] The record indicates that this event could have occurred on either day.

the criminal conversation claim on 4 December 2013, and Defendant filed notice of appeal "as to Plaintiff's claim for alienation of affection[]" on 12 December 2013.

*Discussion*

On appeal, Plaintiff argues that the trial court erred in granting Defendant's motion for summary judgment regarding his claim of criminal conversation. Defendant argues that the trial court erred in denying his motion for summary judgment as to Plaintiff's claim for alienation of affection. We reverse the trial court's order as it relates to Plaintiff's claim of criminal conversation and dismiss Defendant's appeal as interlocutory.

*I. Appellate Jurisdiction*

As Plaintiff recognizes in his brief, the parties' appeals are taken from an interlocutory order. *See Liggett Grp., Inc. v. Sunas*, 113 N.C. App. 19, 23, 437 S.E.2d 674, 677 (1993) ("A grant of partial summary judgment, because it does not completely dispose of the case, is an interlocutory order from which there is ordinarily no right of appeal.") (citations omitted). Therefore, neither party has an immediate right of appeal. *Id.*

> Nonetheless, in two instances a party is permitted to appeal interlocutory orders:

> *first*, where there has been a final
> determination of at least one claim, and the
> trial court certifies that there is no just
> reason to delay the appeal [under] Rule
> 54(b); and *second*, if delaying the appeal
> would prejudice a "substantial right." As
> the court below made no certification, the
> first avenue of appeal is closed.

*Id.* at 23-24, 437 S.E.2d at 677 (citations omitted; emphasis in original).

*A. Plaintiff's Appeal*

Plaintiff argues that the trial court's order affects a substantial right and, therefore, warrants immediate appellate review because his claims are factually interrelated and the trial court's order leaves a potential for inconsistent verdicts. We agree.

> This Court has stated that a
> substantial right is considered affected if
> there are overlapping factual issues between
> the claim determined and any claims which
> have not yet been determined because such
> overlap creates the potential for
> inconsistent verdicts resulting from two
> trials on the same factual issues. In
> *McCutchen*, our Supreme Court addressed the
> merits of an interlocutory appeal when the
> trial court had granted summary judgment on
> the plaintiff's claim for alienation of
> affection[], but left the plaintiff's claim
> for criminal conversation unresolved. [360
> N.C. 280, 282, 624 S.E.2d 620, 623 (2006)].
> The . . . Court reasoned that because the
> two causes of action and the elements of
> damages [were] so connected and intertwined,
> only one issue of damages should be

> submitted to the jury. As a result, the Court ultimately determined that in light of this legal interdependence, the same jury should determine damages for both claims and held that the interlocutory order granting summary judgment on [the] plaintiff's alienation claim [was] subject to appeal.

*Carsanaro v. Colvin*, 215 N.C. App. 455, 457–58, 716 S.E.2d 40, 44 (certain citations, internal quotation marks, certain brackets, and certain ellipses omitted), *disc. review denied*, 365 N.C. 369, 719 S.E.2d 42 (2011).

In this case, as in *Carsanaro*,

> each of [the] plaintiff's causes of actions is based upon injuries suffered as a result of the same underlying conduct: [the] defendant's sexual affair with [the] plaintiff's wife. Since the basis of the claims is the same conduct, the claims necessarily involve overlapping factual issues.

*Id.* at 458, 716 S.E.2d at 44 (allowing immediate appellate review of the trial court's order granting the defendant's motion to dismiss the plaintiff's claim for negligent infliction of a sexually transmitted disease and dismissing as interlocutory the defendant's appeal from the trial court's order denying his motion to dismiss the plaintiff's claims for criminal conversation, intentional infliction of emotional distress, and negligent infliction of emotional distress).

Accordingly, we hold that Plaintiff's appeal affects a substantial right and is properly before this Court.

*B. Defendant's Appeal*

As discussed above, Defendant's appeal is from the same interlocutory order. Despite this fact, Defendant makes no argument that his appeal is properly before this Court and, furthermore, relegates his argument regarding Plaintiff's claim for alienation of affection to his appellee's brief. He has not filed an appellant's brief with this Court. Additionally, Plaintiff has filed a motion with this Court arguing that Defendant's appeal should be dismissed as interlocutory. Defendant has not responded to that motion. We agree with Plaintiff's argument and dismiss Defendant's appeal.

Without addressing the impact of Defendant's failure to file an appellant's brief, we note that an order denying summary judgment is not a final determination of a claim. *Henderson v. LeBauer*, 101 N.C. App. 255, 264, 399 S.E.2d 142, 147, *disc. review denied*, 328 N.C. 731, 404 S.E.2d 868 (1991). Even if the trial court has attempted to certify such an order for appeal, it is not immediately appealable unless it affects a substantial right. *Id.* Defendant has not argued that the trial court's order affects a substantial right and, because the order allows the

action to proceed, we fail to see how any substantial right will be lost by a trial on the issues. *See id.* (reviewing the plaintiff's appeal from the trial court's order granting the defendant's motion for summary judgment in part and dismissing the defendant's appeal from the trial court's order denying summary judgment in part); *see also Carsanaro*, 215 N.C. App. at 458, 716 S.E.2d at 44. Accordingly, we dismiss Defendant's appeal as interlocutory.

*II. Standard of Review*

"Our standard of review of an appeal from summary judgment is *de novo*; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and internal quotation marks omitted; italics added). Review is based only on the pleadings and evidence before the trial court. *Liggett Grp., Inc.*, 113 N.C. App. at 25, 437 S.E.2d at 678 (citations omitted). "The burden of establishing a lack of any triable issue of fact resides with [Defendant] as movant and[,] thus[,] all evidence must be viewed in the light most favorable to [Plaintiff]." *Id.* (citation omitted).

*III. Criminal Conversation*

Plaintiff argues that the trial court erred by granting summary judgment on his criminal conversation claim pursuant to the statute of limitations because there is a genuine issue of material fact regarding when the statute of limitations began to run. We agree.

An action for "criminal conversation" is a civil suit, brought by one party to the marriage against a third party, for adultery. "The elements of [this tort] are the actual marriage between the spouses and sexual intercourse between [the] defendant and the plaintiff's spouse during the coverture. The cause of action is based upon the fundamental right to exclusive sexual intercourse between spouses." *Nunn v. Allen*, 154 N.C. App. 523, 535, 574 S.E.2d 35, 43 (2002), *disc. review denied*, 356 N.C. 675, 577 S.E.2d 630 (2003). The statute of limitations for criminal conversation is three years. N.C. Gen. Stat. § 1-52(5) (2013).

In 2009, the legislature enacted section 52-13 of the North Carolina General Statutes, which provides in pertinent part that "[a]n action for alienation of affection or criminal conversation shall not be commenced more than three years *from the last act of the defendant giving rise to the cause of action*." N.C. Gen. Stat. § 52-13(b) (2013) (emphasis added).

Defendant contends that section 52-13 is controlling in this case because it operates to shorten the applicable statute of limitations.[5] Quoting our opinion in *Reunion Land Co. v. Village of Marvin*, 129 N.C. App. 249, 250, 497 S.E.2d 446, 447 (1998) [hereinafter *Reunion*], Defendant asserts that the applicable rule is as follows: "[W]hen the legislature shortens a statute of limitations, 'a party with a claim at the time of the amendment has a reasonable time to file that claim, but such reasonable time cannot exceed the limitations period allowed under the new law.'" We disagree.

*Reunion* is not controlling in this case. The plaintiffs in *Reunion* brought suit against the town regarding the validity of a zoning ordinance. *Id.* The plaintiffs' cause of action accrued in September of 1996, and they brought suit on 7 February 1997, approximately five months later. *Id.* At the time the cause of action accrued, the statute of limitations was nine months. *Id.* "Effective 1 October 1996," however, the statute was amended to provide for a two-month filing period. *Id.* On appeal, we affirmed the trial court's dismissal of the plaintiffs' suit

---

[5] Because we conclude that section 52-13 is not applicable in this case, we offer no opinion on whether section 52-13 would work to shorten the statute of limitations in this factual context.

pursuant to our opinion in *Spaulding v. R.J. Reynolds Tobacco Co.*, 93 N.C. App. 770, 771, 379 S.E.2d 49, 50 (1989), *affirmed per curiam*, 326 N.C. 44, 387 S.E.2d 168 (1990), because "a party with a claim at the time of the amendment of [the statute of limitations for the filing of an action] has a reasonable time to file that claim, but such reasonable time cannot exceed the limitations period allowed under the new law." *Reunion*, 129 N.C. App. at 250, 497 S.E.2d at 447.

As Plaintiff rightly notes in his brief, the amendment in *Reunion* provided only that it became "effective October 1, 1996." 1995 N.C. Sess. Law 746, sec. 8. Similarly, the updated statute of limitations in *Spaulding* provided only that it would "become effective" on the relevant date. 1985 N.C. Sess. Law 571, sec. 52. Neither statute described how it should be applied to ongoing cases. In this case, however, the legislature has provided that section 52-13 "becomes effective October 1, 2009, *and applies to actions arising from acts occurring on or after that date*." 2009 N.C. Sess. Law 400, sec. 2 (emphasis added). The acts giving rise to Plaintiff's cause of action occurred prior to 1 October 2009. Therefore, to the extent section 52-13 might otherwise be applicable under *Reunion* and *Spaulding*, the legislature has made clear that it is not. Accordingly,

Defendant's argument is overruled, and we proceed without relying on section 52-13.

In *Misenheimer v. Burris*, our Supreme Court clarified that the three-year statute of limitations for criminal conversation is tolled by section 1-52(16), which provides that a cause of action "shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant." 360 N.C. 620, 622, 637 S.E.2d 173, 175 (2006) (quoting N.C. Gen. Stat. § 1-52(16)).

> [I]t is well established that whether a cause of action is barred by the statute of limitations is a mixed question of law and fact. The issue becomes a question of law if the facts are admitted or are not in conflict, at which point summary judgment or other trial judge rulings are appropriate. However, when the evidence is sufficient to support an inference that the limitations period has not expired, the issue should be submitted to the jury.

*Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 643, 643 S.E.2d 28, 33, *disc. review denied*, 361 N.C. 694, 652 S.E.2d 647 (2007) (citations, internal quotation marks, and brackets omitted) (holding that the trial court properly declined to bar the plaintiff's negligence claims involving physical damage to the claimant's property under the statute of

limitations because the parties offered conflicting accounts of the date of discovery of the damage).

Plaintiff filed his complaint on 23 March 2012. Therefore, if Plaintiff did not know or should not have known about the affair prior to 23 March 2009, the statute of limitations does not bar his claim. *See* N.C. Gen. Stat. § 1-52(5), (16). Congruently, if Plaintiff knew or should have known about the affair before that date, then the claim is barred by the statute of limitations. *Id.*

Plaintiff asserts that he discovered, and therefore knew about, the affair on either 25 March 2009 or 26 March 2009, when the investigator found Defendant in the garage. Nevertheless, he argues that there is a genuine issue of fact concerning whether he should have discovered the affair before that point. For support, Plaintiff points to his own repeated statements that he trusted his wife and did not believe she would do this to him. He also notes that, despite hiring a private investigator to confirm the affair, Plaintiff received no concrete evidence until 25 or 26 March 2009. When the investigator called Plaintiff during the beach weekend and informed Plaintiff that he had been unable to find Karen and Defendant together, Plaintiff expressed relief that Carol had been wrong.

Defendant contends, on the other hand, that Plaintiff either knew or should have known about the affair because, at most, "he was willfully blind to the affair between his wife and . . . Defendant." For support, Defendant points to: (1) the fact that the parties had socialized together for approximately five years; (2) Carol's statements to Plaintiff regarding the New Year's Eve incident, the text messages, and the second phone; and (3) the fact that Plaintiff hired a private investigator, indicating that he suspected an affair.

Essentially, the parties ask this Court to choose one factual narrative over another. "We decline to do so, [however,] as such weighing of the evidence and credibility of witnesses is the responsibility of the jury, not an appellate court." *See id.* at 644, 643 S.E.2d at 33. While it strains the credulity of this Court to accept that Plaintiff did not know his wife was having an affair with Defendant, the issue of whether Plaintiff knew or should have known about the affair is one for the jury. *See id.* Therefore, we hold that the trial court erred in granting summary judgment to Defendant. Accordingly, Defendant's argument is overruled, and the trial court's order is reversed as it relates to Plaintiff's claim of criminal conversation.

REVERSED in part; DISMISSED in part.

Judges STROUD and MCCULLOUGH concur.

Report per Rule 30(e).