Bradshaw v. Maiden, 2015 NCBC 76.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 14445

JAMES W. BRADSHAW, CARLA O.
BRADSHAW, RESORT RETAIL
ASSOCIATES, INC., E.C.
BROADFOOT, CHRISTINA DUNN
CHANDRA, JAMES DOYLE, THOMAS
F. EGAN, CHARLES EGGERT, MARK
P. GARSIDE, CLARK GREEN, DR.
JAMES J. GREEN, JR., ROBERT K.
GRUNEWALD, RONALD HOLMES,
DAVID LAUCK, CURT W. LEMKAU,
JR., EVAN MIDDLETON, JOSHUA M.
NELSON, CHRISTIAN C. NUGENT,
PETER B. PAKRADOONI, FORD
PERRY, MARCELLO G. PORCELLI,
ADAN RENDON, RICHARD H.
STEVENSON, PAUL STOKES,
LAWRENCE J. THEIL, R. MITCHELL
WICKHAM, WILLIAM H.
WILLIAMSON, III, WILLIAM K.
WRIGHT, JR., ALEX M. WOLF,
ALPINE CAPITAL III LLC, CHAFFIN
FAMILY LIMITED PARTNERSHIP,
and SOLARIS CAPITAL LLC,

          Plaintiffs,

v.

STEPHEN E. MAIDEN, MAIDEN
CAPITAL, LLC, and SS&C
TECHNOLOGIES INC., successor by
merger to SS&C FUND
ADMINISTRATION SERVICES, LLC
(a/k/a SS&C FUND SERVICES),

          Defendants.

ORDER AND OPINION ON
DEFENDANT SS&C TECHNOLOGIES
INC.'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT

{1}     **THIS MATTER** is before the Court upon Defendant SS&C Technologies Inc.'s (successor by merger to SS&C Fund Administration Services, LLC (a/k/a SS&C Fund Services)) ("SS&C") Motion to Dismiss Plaintiffs' Complaint (the "Motion" or "Motion to Dismiss") in the above-captioned case.

{2}     **THE COURT**, having considered SS&C's Motion, briefs in support of and in opposition to the Motion, and the arguments of counsel at a February 9, 2015 hearing in this matter, hereby **GRANTS in part** and **DENIES in part** the Motion.

*Lewis & Roberts, PLLC, by Gary V. Mauney and James A. Roberts, III, for Plaintiffs James W. Bradshaw, Carla O. Bradshaw, Resort Retail Associates, Inc., E.C. Broadfoot, Christina Dunn Chandra, James Doyle, Thomas F. Egan, Charles Eggert, Mark P. Garside, Clark Green, Dr. James J. Green, Jr., Robert K. Grunewald, Ronald Holmes, David Lauck, Curt W. Lemkau, Jr., Evan Middleton, Joshua M. Nelson, Christian C. Nugent, Peter B. Pakradooni, Ford Perry, Marcello G. Porcelli, Adan Rendon, Richard H. Stevenson, Paul Stokes, Lawrence J. Theil, R. Mitchell Wickham, William H. Williamson, III, William K. Wright, Jr., Alex M. Wolf, Alpine Capital III LLC, Chaffin Family Limited Partnership, and Solaris Capital, LLC.*

*Alston & Bird, LLP, by Ryan P. Ethridge, Michael A. Kaeding, and Jessica P. Corley (pro hac vice), for Defendant SS&C Technologies Inc.*

I.

PROCEDURAL HISTORY

{3}     Plaintiffs' claims arise out of an alleged multi–million dollar fraudulent "Ponzi scheme" that Defendant Stephen E. Maiden ("Maiden") purportedly operated through a "friends and family" hedge fund managed by Defendant Maiden Capital, LLC ("Maiden Capital") (collectively, the "Maiden Defendants").  (Am. Compl. ¶ 1.) Maiden's hedge fund was a limited partnership named the Maiden Capital Opportunity Fund, LP ("MCOF" or the "Fund").  (Am. Compl. ¶ 1.)  Maiden was the managing member of Maiden Capital, and Maiden Capital was the general partner of MCOF.  (Am. Compl. ¶ 55.)  Plaintiffs allege that "Maiden, through Maiden Capital, ran the business and operational activities of his hedge fund, MCOF.  Maiden possessed total control over the Fund."  (Am. Compl. ¶ 54.)

{4}     SS&C functioned as the Fund's administrator from approximately 2007 until the Fund's collapse in 2013.  (Am. Compl. ¶ 56.)  Plaintiffs are limited partners and investors in MCOF and have allegedly suffered net losses of principal from their individual capital accounts in MCOF.  (Am. Compl. ¶ 3.)  Plaintiffs commenced this action by filing their original complaint on August 7, 2014, alleging various claims for relief against Defendants Maiden, Maiden Capital, and SS&C.

{5}     SS&C moved for designation of this action to the North Carolina Business Court on September 5, 2014, and the action was thereafter designated to this Court on September 8, 2014 and assigned to the undersigned on September 11, 2014.

{6}     On November 10, 2014, SS&C filed its Motion to Dismiss, which puts at issue whether Plaintiffs' claims against SS&C – more broadly, whether investor claims against a fund administrator as pleaded here – may survive dismissal under Rules 12(b)(6), 9(b), and 9(k) of the North Carolina Rules of Civil Procedure ("Rules").

{7}     On November 12, 2014, the Court granted Plaintiffs' request to amend the summons and complaint for the limited purpose of correcting the name of the Defendant entity.  On November 25, 2014, Plaintiffs filed an amended complaint and summons ("Amended Complaint").

{8}     On December 23, 2014, Plaintiffs filed their papers in opposition to SS&C's Motion to Dismiss, and a hearing on the Motion was held on February 9, 2015, at which all parties were represented by counsel.

{9}     SS&C's Motion to Dismiss is now ripe for resolution.[1]

II.

BACKGROUND

{10}     The Court does not make findings of fact in ruling on motions to dismiss, "as such motions do 'not present the merits, but only [determine] whether the merits may be reached.'" *Out of the Box Developers, LLC v. LogicBit Corp.*, 2012 NCBC LEXIS 55 at *4 (N.C. Super. Ct. Oct. 30, 2012) (brackets in original) (quoting *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986)). The Court only recites herein the allegations set forth in Plaintiff's Amended Complaint that are relevant to the Court's determination of the Motion. *See, e.g., Concrete Serv. Corp.*, 79 N.C. App. at 681, 340 S.E.2d at 758.

---

[1] Although SS&C's Motion to Dismiss was filed before the Amended Complaint, the Amended Complaint only corrected the name of the Defendant entity, and it appears from the parties' filings that the parties intend for SS&C's previously-filed Motion to Dismiss to serve as a motion to dismiss the Amended Complaint.  Accordingly, the Court deems SS&C's Motion to Dismiss to apply to Plaintiffs' Amended Complaint. *See Emergys Corp. v. Consert, Inc.*, 2012 NCBC LEXIS 19 at *4, fn. 4 (N.C. Super. Ct. April 5, 2012).

{11}      Plaintiffs allege that to induce them to invest in the Fund, Maiden supplied Plaintiffs with a Confidential Private Offering Memorandum ("Offering Memorandum"), along with an accompanying Limited Partnership Agreement of MCOF ("Partnership Agreement") (together with the Offering Memorandum, "Offering Documents").[2] (*See* Am. Compl. ¶¶ 12, 87.) As the sole "managing member" of Maiden Capital, Maiden had "exclusive management and control" of the Fund. (Offering Memorandum § 5.)

{12}      Plaintiffs allege that on May 23, 2013, they discovered Maiden's allegedly fraudulent conduct that led to the collapse of MCOF when Maiden pleaded guilty to securities fraud in the United States District Court for the Western District of North Carolina. (Am. Compl. ¶¶ 2, 230.) The federal court criminal Bill of Information states:

> In order to induce individuals to invest and to keep their funds with Maiden Capital, MAIDEN made a series of false and fraudulent representations, omitted material facts and told deceptive half–truths. MAIDEN represented to victims that the fund was doing well and earning money. By at least February 2009, however, Maiden had lost a substantial amount of all investor funds in a series of failed investments[.]

(Am. Compl. ¶ 2 (quoting Bill of Information).)

{13}      Plaintiffs allege that SS&C, the Fund's administrator at all relevant times, was an "enabler" and played a "key role" in the fraudulent Ponzi scheme by, *inter alia*, reporting fictitious account values to Plaintiffs, "papering over" the Fund's

---

[2] A June 2008 Offering Memorandum, Partnership Agreement, and October 2006 Offering Memorandum are attached to SS&C's Brief in Support of its Motion to Dismiss as Exhibits 1, 2, and 7, respectively. Plaintiffs also expressly reference and rely upon the Offering Memoranda in paragraph 87 of their Amended Complaint and rely upon the Partnership Agreement to establish their alleged damages (*compare* Partnership Agreement § 6.01 *with* Amended Complaint ¶ 12). As a result, the Offering Documents are properly considered by this Court in deciding SS&C's Motion to Dismiss. *See, e.g., Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (On motion under Rule 12(b)(6), the trial court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant.") (citation omitted).

accounting infirmities, and choosing to cease documenting and verifying the Fund's claimed assets. (Am. Compl. ¶¶ 1, 7, 9.)

{14} SS&C's duties as the Fund's administrator, as evidenced by the Administrative Services Agreement ("ASA")[3] executed by SS&C and the Fund on September 1, 2006,[4] included:

(i) "Preparation of general ledger accounts and trial balances for the Fund including either the download of trades or recordation via journal entry of portfolio information as pre-agreed."

(ii) "Preparation and delivery of investor capital statements [("Capital Statements")] on a quarterly basis."[5]

(iii) "Calculation of periodic management fees, performance fees and other periodic amounts payable by the Fund as provided for in the Fund's governing documents."

(iv) "Preparation of economic allocation for investors."

(v) "Calculation of net asset value [("NAV")] for the Fund, as well as performance rates of return."

(vi) "Delivery of reports to the Fund on a monthly basis including NAV reports, performance, trial balance and general ledger reports and reports showing investor capital."

(vii) "Coordination with the Fund's auditors in connection with the Fund's audit."

---

[3] Although Plaintiffs do not attach the ASA to the Amended Complaint, the ASA may be considered by the Court on SS&C's Motion to Dismiss because the ASA is "specifically referred to" in the Amended Complaint, (Am. Compl. ¶ 126), and attached to SS&C's Brief in Support of its Motion to Dismiss as Exhibit 5. *See, e.g., Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d. 858, 862 (2009) ("documents attached, specifically referred to, or incorporated by reference in the complaint" may properly be considered in Rule 12 motion to dismiss without converting motion to summary judgment) (citation omitted).

[4] Maiden signed the ASA as the managing member of Maiden Capital, which is the general partner of MCOF.

[5] In practice, SS&C actually sent Plaintiffs Capital Statements on a monthly basis. (Am. Compl. ¶ 74.)

(viii) "[K]eep at its premises books, records and statements as may be reasonably necessary to document the transactions recorded by [SS&C] on behalf of the Fund."

(ASA pp. 1–2; Pls.' Resp. Opp. Mot. Dismiss, Ex. 7. *See* Am. Compl. ¶¶ 126–39.)

{15} The books and records described in the ASA were to be "based on the information SS&C receive[d] from the Fund or its Management,[6] and from designated third parties which may include the Fund's prime broker, investors, attorneys." (ASA p. 1.) "SS&C [was] responsible for maintaining a record of transactions based on the information supplied." (ASA p. 1.) SS&C was "not . . . responsible for determining the valuation of the Fund's investments, and [could] not perform any Management functions or make any Management decisions with regard to the operation of the Fund." (ASA p. 1.) "In instances where SS&C services include[d] comparing pricing to third party electronic feeds or other sources[,] these services [were] performed as a support function to Management and [did] not limit Management's responsibility for determining the valuation of the Fund's investment portfolio." (ASA p. 2.)

{16} Under the ASA, Management was solely responsible for reviewing and approving all reports, analyses, and books and records that resulted from SS&C's services, evaluating and accepting responsibility for the results of SS&C's services, and accepting responsibility for valuations of the Fund's portfolio investments. (ASA p. 2.)

{17} Plaintiffs allege that Maiden conveyed false information to SS&C, which SS&C used to calculate and analyze the Fund's performance, (*see, e.g.*, Am. Compl. ¶¶ 151–60, 162–65, 170–71), and that Maiden's "Ponzi" scheme could not have continued without SS&C's active participation in the fraud as the Fund's administrator, (Am. Compl. ¶ 191), in part, because the information SS&C provided to Plaintiffs in the Capital Statements was the only means by which Plaintiffs could evaluate their investments in the Fund, (Am. Compl. ¶ 295).

---

[6] "Management," as used in the ASA, refers to Maiden Capital, the Fund's "General Partner as defined in the Limited Partnership Agreement." (ASA p. 1.)

{18}    According to the ASA, SS&C charged a tiered annual fee – based on a fixed charge of $22,500, plus a charge based on a percentage of assets in the Fund (Assets Under Management ("AUM")): (1) 0.10% of AUM between $0–100 million, (2) 0.08% of AUM between $100–250 million, and (3) 0.06% of assets over and above $250 million. (ASA p. 3.)  Thus, the higher the AUM, the more SS&C earned. (*See* ASA p. 3; *see* Am. Compl. ¶¶ 158, 277.)

{19}    Plaintiffs allege that they relied upon the false information passed on to them by SS&C to make initial and additional investments in the Fund and have been damaged due to SS&C's failure to comply with its duties under the ASA. (*See, e.g.*, Am. Compl. ¶¶ 22–53, 145, 150, 281, 287, 297.)  As such, Plaintiffs allege claims against SS&C for gross negligence, grossly negligent misrepresentation, aiding and abetting constructive fraud, aiding and abetting common law fraud, breach of fiduciary duty, violations of N.C. Gen. Stat. § 78A–56(c)(2) ("North Carolina Securities Act" or "NCSA"), civil conspiracy, and punitive damages. (Am. Compl. Counts VI–XIII.)

III.

ANALYSIS

A.  Standard of Review

{20}    "The essential question on a motion under Rule 12(b)(6) 'is whether the complaint, when liberally construed, states a claim upon which relief can be granted on *any* theory.'" *Oberlin Capital, L.P.,* 147 N.C. App. at 56, 554 S.E.2d at 844 (emphasis in original) (quoting *Barnaby v. Boardman*, 70 N.C. App. 299, 302, 318 S.E.2d 907, 909 (1984), *rev'd on other grounds*, 313 N.C. 565, 330 S.E.2d 600 (1985)). When examining the allegations of the Amended Complaint, "the trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint."  *Laster*, 199 N.C. App. at 577, 681 S.E.2d. at 862 (citation omitted).

{21}    However, "[t]he complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief."

*Block v. County of Person*, 141 N.C. App. 273, 277–78, 540 S.E.2d 415, 419 (2000) (citing *Dixon v. Stuart*, 85 N.C. App. 338, 340, 354 S.E.2d 757, 758 (1987)). Rule 12(b)(6) dismissal is proper only "when one or more of the following three conditions is satisfied: (1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985) (citations omitted).

B. Gross Negligence

{22} "Gross negligence has been defined as 'wanton conduct done with conscious or reckless disregard for the rights and safety of others.'" *Toomer v. Garrett*, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002) (citation omitted). The difference between ordinary negligence and gross negligence is substantial. *McDevitt v. Stacy*, 148 N.C. App. 448, 460, 559 S.E.2d 201, 211 (2002) (quotations and citation omitted).

> An act or conduct rises to the level of gross negligence when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the [rights and] safety of others. An act or conduct moves beyond the realm of negligence when the *injury or damage* itself is intentional.

*Yancey v. Lea*, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001) (emphasis in original) (citing *Brewer v. Harris*, 279 N.C. 288, 297, 182 S.E.2d 345, 350 (1971)).

{23} A successful claim for gross negligence requires proof of wanton conduct, and "each of the elements of negligence, including duty, causation, proximate cause, and damages." *Toomer*, 155 N.C. App. at 482, 574 S.E.2d at 92 (citation omitted).

{24} Defendant argues that Plaintiffs' claim for gross negligence should be dismissed because "Plaintiffs do not and cannot adequately allege that SS&C misrepresented anything or deliberately breached any duty of care it owed Plaintiffs." (Def.'s Br. Supp. Mot. Dismiss, p. 24.)

{25} "Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty

must be imposed by law." *Pinnix v. Toomey*, 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955) (citing *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E.2d 551 (1951)).

> The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to endanger the person or property of others.

*Id.* at 362, 87 S.E.2d at 897–98 (citation omitted); *see, e.g., Guthrie v. Conroy*, 152 N.C. App. 15, 25, 567 S.E.2d 403, 411 (2002) ("A duty is defined as an obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks.") (citation omitted). "This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another." *Pinnix*, 242 N.C. at 362, 87 S.E.2d at 898. "No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care," *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006) (citation omitted), and the foreseeability of the plaintiff's injuries "depends on the facts of the particular case," *Id.* at 328, 626 S.E.2d at 267–68 (citation omitted). "Thus, the preliminary question is whether defendant owed a duty of care to plaintiff under the circumstances." *Davidson v. Univ. of N.C. at Chapel Hill*, 142 N.C. App. 544, 553, 543 S.E.2d 920, 926 (2001).

{26}    Plaintiffs allege that SS&C owed a duty to Plaintiffs arising out of SS&C's contract with the Fund. Under North Carolina law, "[t]he duty owed by a defendant to a plaintiff may have sprung from a contractual promise" the defendant made to another, *Oates v. JAG, Inc.*, 314 N.C. 276, 279, 333 S.E.2d 222, 225 (1985) (quotations and citation omitted); however, such duty "must result from some actual working relationship between" the plaintiff and the defendant, *Energy Investors Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000) (citation omitted). *See Oates*, 314 N.C. at 279–80, 333 S.E.2d at 225 ("Whether a defendant's duty to use reasonable care extends to a plaintiff not a party to the contract is determined by whether that plaintiff and defendant are in a relationship in which

the defendant has a duty imposed by law to avoid harm to the plaintiff.") (quotation and citation omitted).

{27}    Plaintiffs make the following allegations in their Amended Complaint in support of their claim that SS&C owed Plaintiffs a legal duty sufficient to sustain a gross negligence claim against SS&C here:

    a.  "SS&C, the Fund's administrator, had a special and direct relationship with [P]laintiffs that gave rise to a duty of reasonable care." (Am. Compl. ¶ 267);

    b.  SS&C, as specifically required under the ASA and as a matter of actual practice, "directly communicated Fund-related financial analysis" to Plaintiffs on a regular basis through monthly Capital Statements, including information about the Fund's "financial status" and the existence and value of the Fund's investments. (*See* Am. Compl. ¶ 268);

    c.  SS&C knew that the Capital Statements it sent to Plaintiffs "would be relied upon by [P]laintiffs to make investment decisions regarding the Fund." (Am. Compl. ¶ 269); and

    d.  SS&C also knew that the Fund advised investors, including Plaintiffs, "during the marketing process, that SS&C was the Fund's independent administrator and accountant." (Am. Compl. ¶ 269).

{28}    Based on the facts pleaded here, the Court concludes that Plaintiffs have adequately alleged a working relationship giving rise to a duty of care owing from SS&C to Plaintiffs.

{29}    Plaintiffs further allege that SS&C breached this duty of care by engaging in two different and broadly-identified types of conduct: first, that SS&C engaged in conduct that SS&C did not actually know – but should have known in the exercise of reasonable diligence – would cause injury to Plaintiffs, and second, that SS&C knowingly engaged in conduct that Plaintiffs allege SS&C knew was in conscious disregard of the rights and safety of Plaintiffs.

{30}    As to the first category of conduct, Plaintiffs contend that SS&C was grossly negligent by "willfully turn[ing] a blind eye to numerous red flags" that should

have put SS&C on notice that the information SS&C received from Management for distribution to Plaintiffs was false, and that, in contrast to the representations in the Capital Statements that SS&C sent to Plaintiffs, the Fund was not profitable and stable and did not contain real and valuable investments. (Am. Compl. ¶ 275–76.) More specifically, Plaintiffs assert that SS&C failed to meet its duty of care in this regard by failing to, *inter alia*, perform accounting services for the Fund in accordance with GAAP and other applicable accounting standards (Am. Compl. ¶ 270), inspect and document the records it received from the Fund (Am. Compl. ¶ 274), verify and document the existence of the primary holdings in the Fund (Am. Compl. ¶ 272), verify the accuracy of the information provided by Management (Am. Compl. ¶ 273), and calculate net asset value (NAV) for the Capital Statements recognizing the true, verified value of the Fund's assets (Am. Compl. ¶ 271).

{31}    As to the second category of conduct, Plaintiffs allege that "SS&C willfully manipulated the Fund's accounting" to sustain the appearance that the Fund was profitable and stable when SS&C knew that the Fund was neither profitable nor stable, (Am. Compl. ¶ 277), "nevertheless issued clean partner capital reports regarding the Fund to investors for years, in spite of its knowledge that Maiden's representations about the Fund's investments and finances could not possibly be true," (Am. Compl. ¶ 278), worked with Maiden to pick "ever-higher numbers out of thin air" to value the Fund on "'made up'" numbers, (Am. Compl. ¶¶ 184–85), and worked alongside Maiden to deceive investors by preparing and sending to Plaintiffs Capital Statements showing that the Fund's balance sheet items were real and valuable when SS&C knew the Capital Statements reflected unverified, non-existent investments at values that SS&C knew were false, (Am. Compl. ¶¶ 151, 276–79; *see* Pls.' Resp. Opp. Mot. Dismiss, pp. 20–22).

{32}    Applying the principles discussed above and as explained below, the Court concludes that the duty of care SS&C owed to Plaintiffs under North Carolina law in the circumstances of this case is largely – but not completely – constrained and limited by the terms of SS&C's contract with the Fund. *See Pinnix*, 242 N.C. at 362, 87 S.E.2d at 898 ("accompanying every contract is a common-law duty to perform

with ordinary care the thing agreed to be done, and . . . a negligent performance constitutes a tort as well as a breach of contract"); *see also Davidson*, 142 N.C. App. at 554–55, 543 S.E.2d at 927 ("where the alleged negligence is premised on a defendant's failure to protect a plaintiff from a harm that the defendant did not directly create, . . . the defendant may be held liable if a special relationship existed between the parties sufficient to impose upon the defendant a duty of care.").

{33}     Under the ASA, SS&C did not have an obligation to verify the accuracy of the documents and records provided to it by Management or serve as the Fund's outside accountant or auditor.  Rather, SS&C's responsibility for maintaining the Fund's record of transactions was "based on the information supplied" to it, and the books and records described in the services to be performed by SS&C were to be "based on the information SS&C receive[d] from the Fund or its Management, and from designated third parties which may include the Fund's prime broker, investors, attorneys." (ASA, p. 1.)  The ASA specifically provides that "SS&C will not maintain custody of any cash or securities, will not have the authority to enter into contracts on behalf of the Fund, or any related party, will not be responsible for determining the valuation of the Fund's investments, and will not perform any Management functions or make any Management decisions with regard to the operation of the Fund." (ASA, p. 1.)  Further, each Capital Statement provided to Plaintiffs by SS&C contained a Statement informing Plaintiffs that the Statements were unverified and unaudited.  (Def.'s Br. Supp. Mot. Dismiss, Ex. 6 (showing sample Capital Statement marked "unaudited and subject to revision" and stating that "[p]erformance results and capital balances are preliminary, unaudited and subject to change").)

{34}     Based on the terms of the ASA, the Court concludes that SS&C contracted away any obligation to provide investment, accounting, and auditing functions for the Fund other than as specifically provided in the ASA.  The Court thus concludes that any duty SS&C owed to Plaintiffs did not include a duty to inspect the records or verify the accuracy of the information provided by Management or to provide independent accounting services to the Fund that were not specifically required of SS&C in the ASA.  As a result, because SS&C did not agree to perform these functions

in the ASA, the Court concludes that any harm to Plaintiffs from SS&C's failure to perform these functions was not reasonably foreseeable under the circumstances. *See, e.g., Caldwell v. Morrison*, 240 N.C. 324, 327, 82 S.E.2d 86, 89 (1954) (holding gas supplier had no duty to inspect gas lines and appliances in non-party customer's home "in the absence of a contract to do so") (citation omitted); *Fazzari v. Infinity Partners, LLC*, ____ N.C. App. ____, ____, 762 S.E.2d 237, 241 (2014) (stating general proposition that "a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party") (quotations and citation omitted); *Lassiter v. Bank of N.C.*, 146 N.C. App. 264, 268, 551 S.E.2d 920, 923 (2001) (holding defendant bank did not have a duty to inspect non-party's property where loan agreement did not contain language obligating defendant bank to "make property inspections before making or allowing a draw" and the "plain language of the purpose clause demonstrate[d] the inspections were to be made, if at all, for the benefit of the lender") (emphasis omitted); *Hoisington v. ZT-Winston-Salem Assocs.*, 133 N.C. App. 485, 489, 516 S.E.2d 176, 180 (1999) (holding defendant security company had no duty to protect against tortious acts of third parties where company contractually agreed to a duty to "'act as a deterrent against theft, vandalism and criminal activities'" by "'maintaining high visibility'"). The Court therefore concludes that, with the limited exception discussed below, SS&C did not have a duty to protect Plaintiffs from Maiden's alleged misconduct beyond complying with its specific duties under the ASA.

{35}     Although the Court has found that SS&C's duty to Plaintiffs is constrained and limited by the ASA as explained above, the Court further concludes that SS&C, as the Fund administrator, cannot escape a duty to refrain from forwarding information to investors like Plaintiffs that it knew was false or inaccurate. Such conduct violates SS&C's obligations under the law, which "imposes on every person engaged in the prosecution of any undertaking . . . to use due care" and "the general duty to so act, or to use that which [you] control[], as not to injure another." *See Pinnix*, 242 N.C. at 362, 87 S.E.2d at 897–98; *Olympic Prods. Co., Div. of Cone Mills Corp. v. Roof Sys., Inc.*, 88 N.C. App. 315, 323, 363 S.E.2d 367 (1988)

("This duty to protect third parties from harm arises under circumstances where the party is in a position so that 'anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or property of the other.'") (citation omitted). Thus, the Court finds that Plaintiffs' second category of alleged conduct – broadly stated, SS&C's willful and knowing dissemination of false information in the Capital Statements it sent to Plaintiffs, willful failure to use GAAP and/or other applicable accounting standards required of SS&C in the ASA in preparing the financial information it distributed to Plaintiffs, and willful manipulation of the Fund's financial figures that it forwarded to Plaintiffs to further Maiden's fraud – sufficiently alleges a violation of the duty of care SS&C owes to Plaintiffs under the circumstances here.

{36} The Court further finds that Plaintiffs have sufficiently alleged wanton and willful conduct by SS&C to survive SS&C's Motion to Dismiss. Specifically, Plaintiffs allege that SS&C knowingly provided information concerning the Fund to Plaintiffs and the Fund's tax preparer that SS&C knew was false and contrary to third-party feeds and other information in SS&C's possession. (Am. Compl. ¶ 276–77.) In particular, Plaintiffs allege that SS&C (i) acted purposely and with knowledge that Plaintiffs would rely on the false financial information SS&C circulated to Plaintiffs; (ii) failed "to properly perform its accounting services for the Fund in accordance with GAAP and other applicable accounting standards," and misrepresented the results of that accounting through SS&C's Capital Statements; (iii) continued to issue Capital Statements to Plaintiffs "despite the fact it knew the Fund's books and records were inaccurate and were not compliant with GAAP [and] that Maiden could not produce evidential matter to support purported Fund investments," so that SS&C could continue collecting "wildly inflated fees based on phony AUM representations;" and (iv) purposely manipulated the Fund's accounting to create a false impression to Plaintiffs that the Fund was "solvent, liquid, profitable and stable." (Am. Compl. ¶¶ 270, 275, 276–79.) As such, the Court concludes

Plaintiffs have satisfied the requirements to plead wanton and willful conduct in support of a gross negligence claim for purposes of Rule 12(b)(6).

{37} Based on its review of the specific allegations of the Amended Complaint, the Court is also satisfied that Plaintiffs have pleaded the remaining elements of a gross negligence claim, including causation, proximate cause, and damages. (Am. Compl. ¶¶ 280–81.)

{38} Accordingly, the Court concludes that SS&C's Motion to Dismiss Plaintiffs' gross negligence claim should be granted insofar as Plaintiffs' claim is based on allegations that SS&C should have known of Maiden's fraud through inspection and verification of the Fund's books and records and other purported "red flags," but should be denied insofar as Plaintiffs' claim is based on allegations that SS&C knowingly and willfully disseminated false and inaccurate information to Plaintiffs, knowingly and willfully failed to utilize GAAP and/or other applicable accounting standards required of SS&C under the ASA in preparing the financial information SS&C provided to Plaintiffs, knowingly and willfully manipulated the Fund's accounting, and all other willful and knowing acts Plaintiffs plead that were in violation of SS&C's duties under the ASA and applicable law.

## C. Grossly Negligent Misrepresentation

{39} A claim for negligent misrepresentation is best stated as follows:

> One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon information if (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and (b) the harm is suffered (i) by the person or one of the class of persons whose guidance the information was supplied, and (ii) because of his *justifiable reliance* upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.

*Helms v. Holland*, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996) (emphasis in original); *see, e.g.*, *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532, 537 S.E.2d 237, 240 (2000) ("The tort of negligent misrepresentation occurs when [(1)] a party justifiably relies [(2)] to his detriment [(3)] on information prepared without

reasonable care [(4)] by one who owed the relying party a duty of care.") (citation omitted) (alterations in original). "Generally, 'to the extent that plaintiff . . . has alleged a breach of that duty of due care and that the breach was a proximate cause of [the plaintiff's] injury, [the plaintiff has] stated a cause of action [for negligent misrepresentation].'" *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 740, 575 S.E.2d 40, 43 (2003) (quoting *Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 669, 255 S.E.2d 580, 585 (1979)). In addition, an accountant's liability for negligent misrepresentation "'should extend not only to those with whom the accountant is in privity or near privity, but also to those persons, or classes or persons, whom he knows and intends will rely on his opinion, or whom he knows his client intends will so rely.'" *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 662, 488 S.E.2d 215, 222 (1997) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 214, 367 S.E.2d 609, 617 (1988)).

{40}    While the North Carolina courts do not appear to have expressly recognized a cause of action for grossly negligent misrepresentation, the Court is not prepared to dismiss the claim on these grounds at this time. Rather, the Court will allow the claim to proceed at this early stage and will assume for purposes of this Motion that a claim for grossly negligent misrepresentation is properly stated by alleging the elements of a claim for negligent misrepresentation, together with allegations of willful and wanton conduct, similar to the allegations necessary to support Plaintiffs' claim for gross negligence as discussed above. *Compare Citibank N.A. v. City of Burlington*, 2013 U.S. Dist. LEXIS 173664 at 33–34 (D. Vt. Dec. 10, 2013) (finding substantial difference between negligent misrepresentation and grossly negligent misrepresentation claims under Vermont law); *Berwind Prop. Grp. Inc. v. Envtl. Mgmt. Grp., Inc.*, 2007 U.S. Dist. LEXIS 96048 at *12–13 (D. Mass. Feb. 5, 2007) (dismissing grossly negligent misrepresentation claim under Massachusetts law where insufficient evidence that defendant acted wantonly or willfully); *Ha-Lo Indus. v. Credit Suisse First Boston, Corp.*, 2005 U.S. Dist. LEXIS 23505 at *10–11 (N.D. Ill. Oct. 12, 2005) (Under Illinois law, grossly negligent misrepresentation requires proof that defendant was grossly negligent in making a representation,

plaintiff relied on defendant's representation, plaintiff's reliance was reasonable, and plaintiff was injured as a result.); and *Newcum v. Lawson*, 672 P.2d 1143, 1144–45 (N.M. Ct. App. 1983) (punitive damage award upheld under New Mexico law where trial court found defendants' actions were intentional, willful, and wanton and therefore constituted intentional, malicious, or grossly negligent misrepresentation) with *Johnson v. Marrs*, 2004 Phila. Ct. Com. Pl. LEXIS 109 at \*5–6 (Pa. Ct. Com. Pl. Dec. 27, 2004) ("There is no cause of action in Pennsylvania for [grossly negligent misrepresentation].").

{41}   The Court has found that SS&C owed Plaintiffs a duty to refrain from forwarding information that it knew was false and inaccurate and that Plaintiffs have alleged that SS&C committed actions in breach of that duty. *Infra*, ¶ 31; (Am. Compl. ¶¶ 289, 294). The Court has further found that Plaintiffs have sufficiently alleged that SS&C's conduct was wanton and willful, asserting that SS&C knowingly provided Capital Statements to Plaintiffs that SS&C knew contained false and inaccurate information, (Am. Compl. ¶ 289), and otherwise concealed the Fund's alleged fraud, (Am. Compl. ¶ 298).

{42}   As to reliance, Plaintiffs allege at various sections of the Amended Complaint that they were entitled to rely on SS&C's representations in the Capital Statements concerning the existence and value of the Fund's assets, (Am. Compl. ¶¶ 287, 297), and that they in fact relied on these misrepresentations in making investments in the Fund, (*e.g.*, Am. Compl. ¶ 287). The Court finds that Plaintiffs have satisfactorily pleaded that they relied on the representations made to them by SS&C and that their reliance on SS&C's representations was justifiable in the circumstances.

{43}   Accordingly, the Court elects, in its discretion, to decline to dismiss Plaintiffs' grossly negligent misrepresentation claim at this time, without prejudice to revisit the claim by later motion practice.

D.  Breach of Fiduciary Duty

{44}   SS&C argues that Plaintiffs do not state a claim for breach of fiduciary duty because a hedge fund administrator owes no fiduciary duty to the Fund's

investors where the administrator does not make any representations to the investors about the accuracy of the fund's investment and asset valuations and the administrator performs only non–discretionary, administrative tasks for the Fund. (Def.'s Br. Supp. Mot. Dismiss, pp. 17–19.)  SS&C particularly stresses that any duties it performed for the Fund were non–discretionary, "back–office" duties, bounded entirely by the ASA, and that SS&C did not participate in the choice of the Fund's investments or assume responsibility for verifying the Fund's assets or valuations. (Def.'s Br. Supp. Mot. Dismiss, pp. 2–3, Def.'s Reply, pp. 6–13.)

{45}    In response, Plaintiff contends SS&C made representations about the accuracy of the Fund's NAV calculations, and that under the ASA, SS&C was required to perform numerous discretionary duties as the Fund's administrator. (Pls.'s Resp. Opp. Mot. Dismiss, p. 4; Am. Compl. ¶¶ 325–28.) Plaintiffs further allege that SS&C's monthly Capital Statements were the only source of information available to Plaintiffs about the Fund and the value of the Fund's investments (aside from statements by Maiden), which gave SS&C a "superior position" vis-à-vis Plaintiffs with respect to "confidential information about Fund investments."  (Am. Compl. ¶ 328; Pls.' Surreply, pp. 4–6.)

{46}    "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 472, 675 S.E.2d 133, 136 (2009) (quotations and citation omitted).  "'[A fiduciary] relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984) (quoting *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971)); *see Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014).  "Fiduciary relationships are characterized by 'confidence reposed on one side, and resulting domination and influence on the other.'" *Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (quoting *Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (2001)).

{47}    The Court has not been able to find any North Carolina cases discussing whether a fund administrator owes a fiduciary duty to an investment fund's investors under North Carolina law.  However, on several occasions, federal district courts in New York have examined whether a fiduciary relationship exists in this context under New York law.  The parties argue that these cases support their respective positions, and the Court finds the New York cases instructive in its consideration of Defendant's Motion under North Carolina law.

{48}    Under New York law,

> [a] fiduciary relationship arises where 'one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party,' and the defendant was 'under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'

*Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 447 (S.D.N.Y. 2010) (citing *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC* ("*Montreal Pension I*"), 446 F. Supp. 2d 163, 195–96 (S.D.N.Y. 2006)).  Applying New York law, federal courts in New York have found that a fiduciary relationship may arise between the fund's administrator and a fund's investors, but only where the administrator exercises discretionary responsibilities and makes specific representations directly to the fund's investors. *See id.* at 441–42.

{49}    For example, in *Montreal Pension I*, a New York federal district court applying New York law denied the fund administrator's motion to dismiss and found that plaintiff investors had properly alleged the existence of a fiduciary duty where the fund administrator agreed to "independently pric[e] the fund by reference to data supplied by . . . independent pricing sources," the fund administrator did not proffer a "document relegating it[s role] to solely ministerial functions or establishing that the [f]unds' manager was exclusively charged with" valuing the funds' portfolio, and the investors pleaded that the fund administrator "held itself out to investors as having policies and procedures to ensure that the [f]unds' valuations would be accurate and fair, and that they relied on these  representations." *Montreal Pension I*, 446 F. Supp. 2d at 196–97.

{50}     Similarly, in *Anwar*, a federal court sitting in New York denied a fund administrator's motion to dismiss and found that plaintiff investors had alleged the existence of a fiduciary duty under New York law where plaintiffs asserted facts showing that the fund administrator marketed itself as an "elite professional[]," "possessed significant authority over the securities at issue," was "allowed to act independent of the Funds," "[was] required to take whatever action was necessary to protect the [Funds'] assets," communicated directly with plaintiff-investors before they invested in the Funds "in the form of Placement Memos that featured, with permission from the [fund administrators], their names, duties, and NAV calculations," accepted money from plaintiff-investors, and sent confirmations of investment. *Anwar*, 728 F. Supp. 2d at 441.

{51}     In contrast, other federal courts in New York have found that a fund administrator did not owe a fiduciary duty to investors under New York law when the administrator did not have discretionary authority in connection with the exercise of its responsibilities to the investment fund. *See, e.g.*, *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. LLC*, 2007 U.S. Dist. LEXIS 75376 at *64–65  (S.D.N.Y. 2007) (dismissing investors' breach of fiduciary duty claim where fund administrator provided nondiscretionary, purely ministerial services such as preparation of account statements); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 443, 447–48 (S.D.N.Y. 2005) (where hedge fund documents limited administrator's role to computing the NAV of the funds, administrator owed no duty to fund shareholders "'to conduct an independent valuation of the securities in the Funds' portfolios'")); *see also Scionti v. First Trust Corp.*, 1999 U.S. Dist. LEXIS 23253 at *131–32 (S.D. Tex. 1999) (where defendant did not participate "in any investment decisions or discretionary matters regarding" plaintiff's funds, and instead merely provided "nondiscretionary" and "ministerial" administrative services under the parties' agreement, no fiduciary duty exists under Texas law).

{52}     Mindful of these federal court decisions and specifically their emphasis on the fund administrator's exercise of discretionary authority in determining the existence of a fiduciary duty, the Court now turns to an examination of whether

Plaintiffs have sufficiently alleged that they reposed the sort of confidence in SS&C, and that SS&C enjoyed the sort of domination and influence over Plaintiffs, that our courts have found gives rise to a fiduciary duty under North Carolina law.

{53}     Plaintiffs seek to establish a fiduciary duty here by making numerous conclusory allegations that a special relationship existed between SS&C and Plaintiffs, with SS&C's resulting domination and influence, (*see, e.g.*, Am. Compl. ¶¶ 9, 86, 114, 122–25, 146–49, 152–56, 159–60, 165, 173, 178, 182, 185, 193, 199, 201–08, 212–13, 216, 229, 231), and to contend variously that SS&C "had superior access to confidential information about Fund investments, including the existence, purported location, security, and value of such assets," (Am. Compl. ¶ 328), that "SS&C held itself out as having unique expertise to conduct the administrative, accounting, and financial services necessary to safeguard Fund and investor interests," (Am. Compl. ¶ 328),  and that the Capital Statements SS&C sent to Plaintiffs were Plaintiffs' "primary source of financial information about the Fund," (Am. Compl. ¶ 329).

{54}     The Amended Complaint and the controlling documents attached to or referenced therein establish, however, that: (1) the ASA was executed between the Fund and SS&C, confirming that Plaintiffs were not in privity of contract with SS&C, (*see* ASA p. 1); (2) under the ASA, SS&C did not have any involvement in Plaintiffs' or the Fund's investment decisions, (*see* ASA); (3) SS&C's only contact with Plaintiffs was its transmission of Capital Statements, which disclosed that the information in the Capital Statements was "unaudited and subject to revision," (Def.'s Br. Supp. Mot. Dismiss, Ex. 6); (4) neither the Capital Statements nor the Offering Documents contained representations that SS&C would provide discretionary services to the Fund, including any duty to independently verify the Fund's investments or their value, (*see* Def.'s Br. Supp. Mot. Dismiss, Exs. 1, 2, 6, 7); and (5) the ASA required SS&C to perform only specified non–discretionary administrative services for the Fund, based solely on data provided by the Fund or its Management, and did not require SS&C to verify the existence or valuation of the Fund's investments or to

maintain custody of documents to validate or authenticate the Fund's investments, (ASA, pp. 1–2).

{55} Indeed, the ASA specifically provides that "[t]he [Fund's] books and records . . . will be based on the information SS&C receive[s] from the Fund or its Management, and from designated third parties which may include the Fund's prime broker, investors, attorneys," (ASA p. 1), and that "SS&C will be responsible for maintaining a record of transactions based on the information supplied." (ASA p. 1.) The ASA further provides that "SS&C will not maintain custody of any cash or securities," "will not be responsible for determining the valuation of the Fund's investments, and will not perform any Management functions or make any Management decisions with regard to the operation of the Fund." (ASA p. 1.) In addition, the ASA describes SS&C's duties as "record–keeping and administrative services," (ASA p. 2), and requires Management to "[p]rovide or cause to be provided, . . . and accept responsibility for, valuations of the Fund's portfolio Investments." Moreover, the ASA required SS&C to make its calculations of the Fund's value based solely on the data provided to it by the Fund, and the Offering Documents make clear that Maiden had sole responsibility for determining the value of the Fund's investments. (ASA, pp. 1–2.)

{56} In sum, as a matter of North Carolina law, the Court finds that SS&C's duties were limited to those contained in the ASA, which primarily consisted of compiling information provided by Management and other outside sources and relaying that information on to the Fund's investors after performing certain ministerial calculations based on the information supplied. The Court thus concludes that SS&C had little, if any, discretion in performing its duties under the ASA, *cf., e.g.*, *Montreal Pension I*, 446 F. Supp. 2d at 196–97; *Anwar*, 728 F. Supp. 2d at 441–42, and therefore that Plaintiffs have failed to allege that Plaintiffs reposed confidence in SS&C, and that SS&C had domination and influence over Plaintiffs, sufficient to plead the existence of a fiduciary duty under North Carolina law. *See, e.g., Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266. Accordingly, the Court concludes

that SS&C's Motion to Dismiss Plaintiffs' claim for breach of fiduciary duty should be granted.

E. <u>Aiding and Abetting Common Law Fraud</u>

{57}     Plaintiffs contend that SS&C knew that Maiden routinely misrepresented to Plaintiffs "that the Fund was stable, solvent, and profitable when it was not, and that the Fund had made investments that did not exist as represented." (Am. Compl. ¶ 318.) As such, Plaintiffs contend that SS&C is liable to Plaintiffs for aiding and abetting Maiden's fraud.

{58}     A decade ago, Judge Tennille of this Court observed that "[n]o North Carolina state court has recognized a claim for aiding and abetting fraud." *Branch Banking & Trust Co. v. Lighthouse Fin. Corp.*, 2005 NCBC LEXIS 4 at *22 (N.C. Super. Ct. July 13, 2005) (Tennille, J.). The same continues to be true today.

{59}     In a holding not yet adopted or rejected by our appellate courts, Judge Tennille concluded at that time that the "North Carolina courts should not recognize a claim for aiding and abetting fraud," *id.* at *22, for the reasons set forth in his then recent decision in *Sompo Japan Ins., Inc. v. Deloitte & Touche, LLP*, 2005 NCBC LEXIS 1 at *9–10 (N.C. Super. Ct. June 10, 2005) (Tennille, J.).

{60}     Judge Tennille persuasively reasoned in *Sampo Japan*,

> This Court cannot distinguish . . . [a] claim [for aiding and abetting fraud] from a direct fraud claim. There must be direct knowledge and intent to defraud. If that is required, the claims are redundant. . . . If professionals such as accountants and lawyers could be held liable for fraud when their clients used their services to defraud a third party without the professionals' intent to participate in the fraud, the costs of such services would be prohibitive to all but the affluent. Such professionals would either have to incur the expense of investigation into how their services were being used or be placed in the position of insurers of their clients' honesty. Either burden would add an unacceptable cost to the provision of necessary and desirable services. Also, it seems illogical to impose liability for aiding and abetting fraud based upon a lower level of scienter than fraud itself. Nor would  it  be

consistent with the cases in which the North Carolina courts have based joint liability on comparable culpability. Without knowledge and similar intent, there can be no joint effort or concert in action.

*Sompo Japan*, 2005 NCBC LEXIS 1 at *9–10.

{61}    The Court finds Judge Tennille's reasoning compelling and equally applicable to the circumstances Plaintiffs have alleged here. Accordingly, the Court concludes Plaintiffs' claim for aiding and abetting fraud should be dismissed.

F.    Aiding and Abetting Constructive Fraud

{62}    The Court is not aware of a North Carolina case recognizing a claim for aiding and abetting constructive fraud under North Carolina law. Courts considering the question have concluded that, if recognized, the claim is similar to a claim for aiding and abetting a breach of fiduciary duty. *See, e.g.*, *Phillips & Jordan v. Bostic*, 2012 NCBC LEXIS 36 at *25–26 (N.C. Super. Ct. June 1, 2012) (Murphy, J.) (a "claim for aiding and abetting constructive fraud is really a claim for aiding and abetting breach of fiduciary duty") (citation omitted); *In re Bostic Constr., Inc.*, 435 B.R. 46, 67 (Bankr. M.D.N.C. 2010) ("If North Carolina were to recognize a claim for aiding and abetting constructive fraud, then it would likely contain some of the same elements as a claim for aiding and abetting breach of fiduciary duty, with the addition of a confidential or fiduciary relationship of which the defendant has taken advantage to the harm of the plaintiff."); *Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 383 F. Supp. 2d 587, 600 (S.D.N.Y. 2005) (Applying North Carolina law, "[i]t follows that the only difference relevant here between a cause of action for aiding and abetting constructive fraud  and one for aiding and abetting breach of fiduciary duty is that the former would contain the additional requirement that the primary violators . . . benefitted themselves.").

{63}    As numerous North Carolina decisions have now recognized, however, it is also unclear whether North Carolina recognizes a claim for aiding and abetting a breach of fiduciary duty. *See, e.g., Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv.*, 2015 NCBC LEXIS 13 at *6 (N.C. Super. Ct. Feb. 4, 2015) ("Whether North Carolina recognizes a claim for aiding and abetting a breach of fiduciary duty remains

an open question."); *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33 at *17 (N.C. Super. Ct. Oct. 19, 2007) (same).

{64}    Judge Gale recently declined to dismiss an aiding and abetting breach of fiduciary duty claim, in part, because of the current uncertainty regarding the viability of the claim under North Carolina law and, in part, because discovery on the aiding and abetting claim substantially overlapped anticipated discovery on plaintiff's civil conspiracy claim. *See Veer Right Mgmt. Grp., Inc.*, 2015 NCBC LEXIS 13 at *8–9.  The Court is persuaded that the current uncertainty concerning the viability of a claim for aiding and abetting constructive fraud under North Carolina law and the anticipated overlapping discovery on Plaintiffs' claims for aiding and abetting constructive fraud, civil conspiracy, gross negligence and grossly negligent misrepresentation – all of which focus on SS&C's alleged knowing participation in Maiden's alleged fraud – are sufficiently similar to the circumstances in *Veer Right* to compel similar treatment.  Accordingly, the Court elects, in its discretion, to decline to dismiss Plaintiffs' aiding and abetting constructive fraud claim at this time, without prejudice to revisit the claim by later motion practice.

G.  <u>NCSA – N.C. Gen. Stat. § 78A-56(c)(2)</u>

{65}    Section 78A-56(c)(2) of the North Carolina Securities Act provides that

> every employee of a person [primarily liable for securities fraud] who materially aids in the transaction giving rise to the liability and every other person who materially aids in the transaction giving rise to the liability is also liable jointly and severally with and to the same extent as the person if the employee or other person actually knew of the existence of the facts by reason of which the liability is alleged to exist.

N.C. Gen. Stat. § 78A-56(c)(2) (2014).

{66}    Judge Gale has set forth the standard for pleading a claim for secondary liability under the NCSA:

> To state a cause of action for secondary liability under § 56(c)(2), in addition to proof of primary liability, a plaintiff must plead that the defendant (1) is an employee of the seller or offeror or any other person; (2) materially aided in the transaction; and (3) 'actually knew of the existence of the facts by reason of which the liability is alleged to exists.'

*NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11 at *49 (N.C. Super. Ct. Feb. 19, 2013) (quoting N.C. Gen. Stat. § 78A-56(c) (2013)) (granting defendants' motions to dismiss in part).

{67}    Defendants argue that Plaintiffs' secondary liability claim under the NCSA should be dismissed because (i) Plaintiffs' allegations against SS&C do not rise to the level of "substantial assistance," (Def.'s Br. Supp. Mot. Dismiss, p. 26), (ii) SS&C did not have actual knowledge of Maiden's violation, (Def.'s Br. Supp. Mot. Dismiss, p. 28), and (iii) Plaintiffs have not alleged that SS&C had the same level of culpable scienter as the Maiden Defendants, (Def.'s Br. Supp. Mot. Dismiss, p. 29).

{68}    The Court finds SS&C's contentions unpersuasive.  First, the Court concludes that Plaintiffs have sufficiently alleged "material aid" as required under the statute.  Although the term "materially aid" has not previously been defined by statute or interpreted by our appellate courts, the Court, for purposes of Rule 12(b)(6), will follow Judge Gale's reasonable approach in *NNN Durham* to require that allegations of "material aid" identify conduct that rises to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the NCSA.  *NNN Durham*, 2013 NCBC LEXIS 11 at *49 ("While the court reserves a final determination of a comprehensive definition of 'material aid,' for purposes of the present Rule 12(b)(6) motion the court will require allegations of conduct which rises to the level of having contributed substantial assistance  to the act or conduct leading to primary liability under the NCSA, and, when later assessing plaintiff's proof, will apply the concept of 'substantial assistance' restrictively."); *see also Cannon v. GunnAllen Fin., Inc.*, 2007 U.S. Dist. LEXIS 59597 at *21–22 (M.D. Tenn. Aug. 14, 2007) (comparing cases interpreting "material aid" under numerous state securities laws).

{69}    In paragraphs 337–39 of the Amended Complaint, Plaintiffs allege that SS&C materially aided Maiden by "re-classing Fund transactions," "actively concealing the Fund's material accounting infirmities," "improperly accepting and acting upon information and data from the Maiden [D]efendants that it knew was false," and "by reporting income and AUM Fund results to investors that it knew was

false or could not be true," and further that "[b]oth the Maiden [D]efendants and SS&C engaged in fraudulent or deceitful acts that concealed from investors the fact that the Fund was a Ponzi scheme." (Am. Compl. ¶¶ 337–39.) The Court finds that these allegations are sufficient to plead "material aid" under the NCSA for purposes of Rule 12(b)(6).

{70}   Second, while proving the existence and extent of Plaintiffs' actual knowledge of Maiden's violation may prove to be an obstacle for Plaintiffs during later proceedings, at this juncture, the Court concludes that Plaintiffs' various allegations that "SS&C actually knew of the existence of the facts by reason of which liability is alleged to exist against the Maiden defendants," (*e.g.*, Am. Compl. ¶ 337), is sufficient to withstand Defendants' motion to dismiss under Rule 12(b)(6).

{71}   Last, Defendants contend that Plaintiffs have not adequately pleaded scienter under N.C. Gen. Stat. § 78A-56(c)(2). This Court has previously held, in the context of considering a claim for aiding and abetting a breach of fiduciary duty, that "it will require proof that the 'aiding and abetting party [] have the same level of culpability or scienter' as the primary tort-feasor." *NNN Durham*, 2013 NCBC LEXIS 11 at *48 (quoting *Tong*, 2012 NCBC LEXIS 16 at *26). In addition, our courts have recognized that "[l]iability based on 'materially aiding' arguably is comparable to tort liability based on 'aiding and abetting.'" *Id.* at *42. North Carolina courts, however, have not yet addressed whether the level of proof of scienter required to state a claim for aiding and abetting a breach of fiduciary duty – if such a claim exists under North Carolina law – is the same as the level of proof of scienter required to state a claim of primary liability under the NCSA. As with Plaintiffs' claim for aiding and abetting constructive fraud, the Court elects, in its discretion, to decline to dismiss Plaintiffs' secondary liability claim on this basis at this time, without prejudice to revisit the claim by later motion practice.

H. Count XII – Civil Conspiracy

{72}   SS&C argues that Plaintiffs have failed to state a claim for civil conspiracy, contending that Plaintiffs have alleged only a suspicion or conjecture of conspiratorial agreement between SS&C and Maiden. *See, e.g., Lenzer v. Flaherty*, 106 N.C. App.

496, 511, 418 S.E.2d 276, 285 (1992) (agreement to conspire may be implicit or explicit but must raise more than a conjecture or suspicion as to the existence of the agreement). SS&C further contends that Maiden admitted to misleading SS&C in order to perpetuate the "Ponzi" scheme, precluding actual agreement. (Def.'s Br. Supp. Mot. Dismiss, p. 30.) In response, Plaintiffs argue that their claim for civil conspiracy is properly stated because, although Maiden may have contended that he misled SS&C, Plaintiffs' numerous factual allegations are at odds with that contention, and Maiden's factual claim is not determinative and does not foreclose an actionable claim for civil conspiracy. (Pls. Resp. Opp. Mot. Dismiss, p. 28.)

{73} It has long been observed that "there is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) (citations omitted). "Instead, civil conspiracy is premised on the underlying act." *Piraino Bros., LLC v. Atl. Fin. Group*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011) (quotations and citation omitted).

> 'The elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.'

*Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (citing *Privette v. Univ. North Carolina*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989)). A civil conspiracy is an action "'for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone.'" *Henderson v. LeBauer*, 101 N.C. App. 255, 260, 399 S.E.2d 142, 145 (citation omitted).

{74} Based on its review of the Amended Complaint, the Court concludes that Plaintiffs have sufficiently alleged facts supporting each of the required elements for a claim of civil conspiracy under North Carolina law. In particular, Plaintiffs have alleged that SS&C engaged in fraudulent conduct with Maiden and have supported those conclusory allegations by reference to numerous communications between SS&C and Maiden that, when taken in the light most favorable to Plaintiffs, permits

an inference that SS&C and Maiden agreed to work together to distribute false financial information to Plaintiffs in a scheme to perpetuate a fraud on the Fund's investors. (*See, e.g.*, Am. Compl. ¶¶ 189, 343.) The Court further finds that Plaintiffs' allegations "allow [SS&C] to understand the nature of the claim and to prepare for trial." *See Haynie v. Cobb*, 207 N.C. App. 143, 149, 698 S.E.2d 194, 198 (2010). Accordingly, the Court concludes SS&C's Motion to Dismiss Plaintiffs' civil conspiracy claim should be denied.

I. <u>Punitive Damages</u>

{75}    SS&C argues that Plaintiffs have not pleaded sufficiently particularized allegations of the aggravating factors of Plaintiffs' claims that would warrant an award for punitive damages as required by North Carolina Rule of Civil Procedure 9(k).

{76}    Punitive damages can be awarded where SS&C is liable for compensatory damages and one of the following aggravating factors applies: (1) fraud, (2) malice, or (3) willful or wanton conduct. N.C. Gen. Stat. § 1D–15 (2014). "A demand for punitive damages shall be specifically stated, except for the amount, and the aggravating factor that supports the award of punitive damages shall be averred with particularity." N.C. Gen. Stat. § 1A-1, Rule 9(k).

{77}    As discussed above, the Court finds that Plaintiffs have sufficiently alleged the fraud and willful and/or wanton conduct that support their claims for fraud, gross negligence, and grossly negligent misrepresentation. Thus, the Court concludes that Plaintiffs' request for punitive damages should survive Defendant's Motion to Dismiss at this early stage of this litigation, without prejudice to revisit the claim by later motion practice.

IV.

CONCLUSION

{78}    In consideration of, and consistent with, the foregoing, the Court hereby (i) **DENIES in part** and **GRANTS in part** SS&C's Motion to Dismiss Plaintiffs' claims for Gross Negligence and Grossly Negligent Misrepresentation as more specifically set forth in this Order and Opinion, (ii) **DENIES** SS&C's Motion to Dismiss Plaintiffs'

claims for Aiding and Abetting Constructive Fraud, violation of the NCSA (N.C. Gen. Stat. § 56(c)(2)), Civil Conspiracy, and Punitive Damages, and (iii) **GRANTS** SS&C's Motion to Dismiss and dismisses **WITH PREJUDICE** Plaintiffs' claims for Breach of Fiduciary Duty and Aiding and Abetting Common Law Fraud.

**SO ORDERED**, this the 10th day of August, 2015.

<u>/s/ Louis A. Bledsoe, III</u>
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases